[No. 38204.    Department One.    January 12, 1967.]

THE STATE OF WASHINGTON, *on the Relation of William N. Myhre et al., Respondent,* v. THE CITY OF SPOKANE *et al., Appellants.**

*Reported in 422 P.2d 790.

*John P. Tracy, Jr., Norman dePender, Matt L. Alexander, Dudley L. Wilson, Thomas P. Graham, Don R. Shaw, Jr.,* and *Edward E. Shaw,* for appellant City of Spokane.

*T. David Gnagey,* for appellant Walther *et al.*

*Willard J. Sharpe* and *Clarence P. Smith,* for respondents.

OTT J.—May 5, 1958, the City Council of Spokane passed ordinance No. C15434, designated as The Comprehensive Zoning Ordinance of the City of Spokane, which established zoning classifications of real property located within the city limits.

April 29, 1963, the city council, by ordinance No. C17494, amended the comprehensive zoning ordinance, reclassifying the following described property from " 'R1' One-Family Residence Zone" to " 'B2' Community Business Zone":

Lots 1 to 12, inclusive, the east 20 feet of Lots 13 and 14, and all of Lots 15 to 26, inclusive, Block 3; and vacated Thirtieth Avenue beginning at the southeast corner of Lot 26, thence west to point 30 feet east of southwest

corner of Lot 14, thence south 10.06 feet, thence west 30 feet, thence south to northwest corner of Lot 13, Block 4, thence east to northeast corner of Lot 1, Block 4, thence north to point of beginning; and Lots 1 to 26, inclusive, Block 4; all in First Addition to Acre Park Addition.

At the time of the adoption of the amendatory ordinance, the city entered into an agreement with the Manito Crestville Company, a copartnership (hereinafter referred to as the company), whereby the owners of property in the reclassified area agreed to pay $75,000 toward the construction costs of certain streets which would result from the development of a shopping center in the rezoned business area.

June 28, 1963, William N. Myhre, Robert Sater, and other residential property owners in the city of Spokane, commenced an action against the city of Spokane, seeking a writ of certiorari to review the validity of amendatory ordinance No. C17494, contending that the ordinance was unconstitutional, null and void, and that its adoption constituted arbitrary and capricious conduct on the part of the city council of Spokane. The company and certain property owners were permitted to intervene in the action.

The superior court granted the writ. After the issues were joined, the cause was heard solely upon the record made before the Spokane City Plan Commission and the city council. No witnesses were called, and no evidence was introduced in the superior court that had not been considered by the city council prior to the adoption of the amendatory ordinance.

The court entered findings of fact and conclusions of law, and adjudicated the amendatory ordinance "to be null and void and of no force and effect."

The city of Spokane and the intervenors have appealed.

On appeal, the city of Spokane assigns error to the court's findings of fact, to its failure to enter appellant's proposed findings, and to its adjudication that the ordinance was void.

The intervenors have submitted a concise statement of points upon which they rely on appeal, which, *inter alia*,

asserts that the court erroneously entered its findings of fact, conclusions of law, and judgment, and further erred in failing to enter judgment for the appellant city and the intervenors.

The appellant's and the intervenors' several assignments of error may be summarized as follows:

The trial court erred in entering its findings of fact and judgment (1) that the city council acted arbitrarily in enacting the questioned ordinance, and (2) that the concomitant agreement with the company constituted an ultra vires act by the city council and was void.

Did the city council properly exercise its police power in enacting the amendment to the zoning ordinance?

■ Zoning is a discretionary exercise of police power by a legislative authority. *Lillions v. Gibbs*, 47 Wn.2d 629, 289 P.2d 203 (1955). Courts will not review, except for manifest abuse, the exercise of legislative discretion. *State ex rel. Smilanich v. McCollum*, 62 Wn.2d 602, 384 P.2d 358 (1963). Manifest abuse of discretion involves arbitrary and capricious conduct. Such conduct is defined to be without consideration and in disregard of the facts. *State ex rel. Lopez-Pacheco v. Jones*, 66 Wn.2d 199, 401 P. 2d 841 (1965); *State ex rel. Cosmopolis Consol. School Dist. No. 99 v. Bruno*, 61 Wn.2d 461, 378 P.2d 691 (1963). One who asserts that a public authority has abused its discretion and is guilty of arbitrary, capricious, and unreasoning conduct has the burden of proof. *State ex rel. Lopez-Pacheco v. Jones, supra; State ex rel. Longview Fire Fighters Union, Local 828, v. Longview*, 65 Wn.2d 568, 399 P.2d 1 (1965). If the validity of the legislative authority's classification for zoning purposes is fairly debatable, it will be sustained. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 71 L. Ed. 303, 47 Sup. Ct. 114, 54 A.L.R. 1016 (1926).

In the instant case, the Spokane City Plan Commission, after several years of study, had recommended that the comprehensive zoning ordinance be amended. The plan commission's report to the city council, filed January 30, 1963, was as follows:

At its meeting November 7, 1962, the City Plan Commission approved the petition of Manito Crestville Company to rezone land immediately east of the existing business zone at 30th Avenue and Grand Boulevard subject to an agreement as to plans and development of the center. This decision was arrived at after very careful analysis of the need for more business zoned land on the south hill, the effect of such rezoning on existing and anticipated development, traffic considerations, the interests of property owners in the area, the public welfare and other related matters.

The Commission was of the opinion that improved shopping facilities are needed to serve the west half of the south hill and that it is in the best interest of the City and the south hill to provide land for such a facility by expanding the existing business area at 30th Avenue and Grand Boulevard.

The basis for this decision is that the amount of "B2" Community Business land zoned on the south hill is not commensurate with the purchasing power and needs of the present nor the potential population within the Manito trade area as intended by the zoning ordinance and land use plan. Under this condition, the comprehensive development of the south hill is incomplete, the stability of property development is jeopardized, and unnecessary travel to obtain primary shoppers goods is forced on the residents of this section of the City. Where such need is not satisfied by a planned development, then ribbon business usually results which is one of the poorest and most inefficient forms of business development. This should and can be avoided in large measure by a well designed shopping center.

In recommending the Manito Crestville center, the Commission was deeply aware of the merits of alternate proposals and the advantages and disadvantages of the Manito Crestville center. Recognizing the need for more "B2" business land for the west half of the south hill, the Commission felt expansion of the existing "B2" zone at 30th and Grand is the better available solution to the problem. This center is centrally located in the trade area, does not conflict with the established zoning pattern, does not intrude into the Lincoln Heights trade area, and if allowed to develop as proposed, should do much to rejuvenate the existing business area and to provide a reasonable community business center for the

west half of the south hill. The center has good arterial access. Much is being done to reasonably handle traffic problems by the shopping center constructing at its own expense street widenings required by the City Traffic Engineering Director.

The size of the center and business zone at 30th and Grand would not only be reasonable for the trade area but it is such as to not unduly draw from the central business district nor other established business areas.

The layout of the center has been carefully designed to obtain the best possible facility, maximum possible ease of traffic circulation, protection of adjoining residences, and coordination with the existing business at 30th and Grand.

This recommendation keeps faith with the residents, property owners and business men of the south hill and in our judgment is most consistent with and desirable for the comprehensive development of the south hill and the city.

At its meeting January 16, 1963 the Commission reviewed and accepted the petitioner's agreement and ordered the plans and agreement transferred to the City Council with its recommendation of rezoning. Therefore the Commission recommends that your Honorable Body amend the Zoning Ordinance No. C15434 to such extent as is necessary to change the classification of Lots 1 to 12 inclusive, the east 20′ of Lots 13 and 14, and Lots 15 to 26 inclusive, Block 3; and vacated 30th Avenue beginning at the southeast corner of Lot 26, thence west to point 30′ east of southwest corner of Lot 14, thence south 10.06′, thence west 30′, thence south to northwest corner of Lot 13, Block 4, thence east to northeast corner of Lot 1, Block 4, thence north to point of beginning; and Lots 1 to 26 inclusive, Block 4, all in First Addition to Acre Park Addition (City), from an "R1" One-Family Residence Zone to a "B2" Community Business Zone.

Because of the importance of this proposal to the comprehensive development of the south hill, the Commission respectfully requests that should there be any question on the proposal that at the Council's convenience the Commission meet with the Council in executive session to consider the proposal before the Council takes action on this recommendation of rezoning.

In addition to the report and recommendation of the plan commission, the record establishes that the Virgil A. War-

ren Advertising Agency of Spokane conducted a comprehensive poll within a radius of one and one-half miles from the proposed Manito shopping center. There was a high percentage of response to the poll and a majority favored the proposal. At the public hearings before the city council, numerous persons testified both for and against the proposal. After giving due consideration to the issue presented, the city council passed the amendment to the ordinance.

It is not an abuse of discretion or arbitrary and capricious conduct for public officers to accept the conclusions of proponents of an issue which is honestly debatable.

Relators contend that the city council failed to enter findings of fact which were required prior to the adoption of the amendment. Section 320.10 (b) of the comprehensive zoning ordinance provides in part:

> If after consideration of the Commission's report the City Council *finds* such amendment is of public necessity, benefits the general welfare of the Community, or constitutes good zoning practice, it may then so amend this Ordinance. (Italics ours.)

██ The ordinance does not require written findings of fact. The word "finds," as used in the ordinance, means nothing more than a legislative or administrative determination. *State ex rel. Smilanich v. McCollum,* 62 Wn.2d 602, 606, 384 P.2d 358 (1963). That such a determination was made by the city council inheres in its adoption of the amendment.

Applying the legal principles above set out to the facts portrayed in the record before us, the trial court erred in its determination that the city council abused its discretion in adopting the questioned amendment to the zoning ordinance.

Was the concomitant agreement which the city council entered into with the company ultra vires?

The agreement recognized that the shopping center would increase the flow of traffic around its perimeter, which would entail widening the streets for traffic safety, and the parties agreed that the sum of $75,000 represented

a fair estimate of the cost of completing the improvements . . . necessitated by the aforesaid rezoning. This sum shall represent the total responsibility of the Company for the accomplishment by the City of the street improvements . . . . From and after date of receipt thereof such funds shall be *conclusively and irrevocably committed to finance said improvements* . . . . . . . .

3. Construction of the planned shopping center as one unit together with all ground improvements are expected to be commenced within two years after the effective date of the ordinance changing the classification . . . . (Italics ours.)

The company agreed to deed to the city without cost, certain of its lands for the widening of the adjacent streets within the city engineer's right-of-way plan for the area. The company agreed to acquire and convey to the city, without cost, additional street area (if any) needed for traffic safety.

The questioned agreement further provides that "the Company shall cause to be constructed at no cost to the City the necessary curbs, sidewalks, drainage, pavement, channelization and street lighting" on certain designated streets, and that "All street improvements, medians and channelizations are to be laid out and constructed satisfactory to the City Engineer and the City Traffic Engineer."

The company agreed to develop the shopping center in accordance with plans filed November 5, 1962, any deviations to be approved by the city. The city likewise will control landscaping and signs, and the "Design, exterior finish and color of the buildings shall be correlated as one center, attractive and of high quality construction."

Part of the property contemplated to be included in the shopping center has not yet been acquired. When it is acquired, the company will petition for vacation of designated streets which presently bisect the area, in order that the center will be a continuous unit.

Before the opening of the shopping center, the company agreed to remove all existing buildings from the property,

and to "complete the construction of the parking facilities in accordance with the said plans filed with the Commission."

It is contended that, by this contract, the city bargained away its power and authority to legislate, in the following particulars: (1) It has agreed to *condemn* certain property for right-of-way purposes if the company cannot acquire it by negotiation, and (2) it has agreed to vacate certain streets on land to be acquired by the company to make the company's property larger and thereby acceptable to the city as a shopping center.

■ With reference to (1), the city has not agreed to condemn. The company has agreed to reimburse the city for its costs in the event traffic safety requires condemnation for right-of-way purposes.

The reimbursement to the city of its costs in this regard has been recognized as proper by the legislature, in the establishment of local improvement districts. RCW 35.44.020 itemizes, *inter alia*, the costs to be paid by the property owners specially benefited by a local improvement, as follows:

There shall be included in the cost and expense of every local improvement for assessment against the property in the district created to pay the same, or any part thereof:

(1) The cost of the portion of the improvement within the street intersections;

(2) The estimated cost and expense of all engineering and surveying necessary for the improvement done under the supervision of the city or town engineer;

. . . .

(6) All cost of the acquisition of rights of way, property, easements or other facilities or rights, whether by *eminent domain,* purchase, gift, or in any other manner:
. . . . (Italics ours.)

The legislature has authorized city councils, in establishing local improvement districts, to require that the owners of property benefited reimburse the city for costs of condemnation necessary for the regulation of anticipated traffic.

Widening streets and installing electrical controls for the safety of both pedestrians and vehicular traffic are regulatory measures which are within the proper exercise of the city's police power. When the city requires that the cost of such safety measures be borne by the company, it is not bargaining away its regulatory police power but, rather, determining that the cost should be borne by the persons who created the necessity for the expenditure of such funds, instead of by the city generally. Such a determination is within the city's legislative authority. It follows that a written concomitant agreement resulting therefrom is not ultra vires.

Other jurisdictions have recognized that such contracts are valid and are not violative of the right of the legislative body to exercise police power. *Bucholz v. Omaha,* 174 Neb. 862, 120 N.W.2d 270 (1963); *Sylvania Electric Prods. v. City of Newton,* 344 Mass. 428, 183 N.E.2d 118 (1962); *Church v. Town of Islip,* 8 N.Y.2d 254, 203 N.Y.S.2d 866 (1960).

■ There are jurisdictions which hold that all zoning ordinances which are amended, with concomitant agreements, are invalid. We hold the better rule to be that, before deciding to amend a zoning ordinance, the city must weigh the benefits which will flow to the public generally against the detriment, if any, to the adjacent property owners or to the public which may result therefrom. An amendment to a zoning ordinance and a concomitant agreement should be declared invalid only if it can be shown that there was no valid reason for a change and that they are clearly arbitrary and unreasonable, and have no substantial relation to the public health, safety, morals, and general welfare, or if the city is using the concomitant agreement for bargaining and sale to the highest bidder or solely for the benefit of private speculators.

It is contended that the city has agreed to exercise its power of eminent domain to obtain the necessary right of way for traffic regulation and safety, and that such an agreement is ultra vires and void; further, that the threat

of condemnation by the city constitutes a compelling influence upon property owners to sell to the company.

Section 4 of the agreement describes the streets which it is contemplated will require widening in order to afford adequate traffic safety adjacent to the shopping area. With reference to the acquisition of land for traffic safety purposes, § 4 provides:

> It is intended that the Company shall have the opportunity and shall make reasonable effort to acquire the said land in those cases where the Company does not presently own it. However, in cases where the Company does not own the land needed for right of way purposes, *the building permit shall not be withheld where reasonable effort to purchase the said land fails because of an unwilling third party.*
>
> In the event that the City of Spokane shall obtain the said land by condemnation, the Company agrees to pay the value of the land as determined by said condemnation proceedings and the reasonable costs incurred by the City in said proceedings. Prior to the institution of said condemnation the Company agrees to provide the City with reasonable security to guarantee the said payment. (Italics ours.)

By this section, the company has agreed to exert every reasonable effort to acquire such rights of way as the city deems necessary for traffic safety. The words, *"In the event that the City of Spokane shall obtain the said land by condemnation,"* contemplate that the city will institute condemnation proceedings only if it determines that the widening of the streets is necessary for traffic safety and control.

In a condemnation proceeding, an owner does not lose dominion over his property until the city has established, in a court of competent jurisdiction, that the additional land is necessary for public use. If the court resolves the issue of public use and necessity favorably to the city, the jury is the final arbitrator of the amount to be paid for the acquisition. It is common practice to make every effort to acquire the land from the owner without the necessity of condemnation proceedings. When the property

necessary for traffic safety cannot be obtained by bargaining for it, such needed property can be acquired only by eminent domain proceedings. The threat of condemnation is present in every instance when land is needed for right-of-way purposes, and the parties cannot amicably agree upon the amount necessary to constitute just compensation.

Under the facts of this case, we conclude that the requirement that the company pay the costs of eminent domain proceedings, if any are required, was not a bargaining away of the city's police power, but was in furtherance of it.

With reference to (2), does §13 of the agreement bargain away the city's police power to vacate certain streets?

RCW 35.79.010 provides, *inter alia,* that one who seeks to vacate streets within an incorporated city must file a petition requesting it, and that, thereafter, the city "by resolution shall fix a time when the petition will be heard and determined by such authority . . . which time shall not be more than sixty days nor less than twenty days after the date of the passage of such resolution." RCW 35.79.030 provides in part: "*If the legislative authority determines to grant said petition* or any part thereof, such city or town shall be authorized and have authority by ordinance to vacate such street . . . ." (Italics ours.)

Under the statute, the legislative authority functions in a quasi-judicial capacity in determining the merits of such petitions and weighing the evidence of the proponents and objectors. If it finds the petition meritorious, it then exercises its legislative authority by enactment of the ordinance.

The questioned §13 of the agreement provides:

> The Company shall petition for the vacation of Thirtieth Avenue from Grand Boulevard to Hatch Street and of Hatch Street from Twenty-ninth Avenue to Thirtieth Avenue at such time as the Company becomes the owner of the abutting properties or has agreement of owners of said properties.

This section grants to the company nothing more than its statutory right to petition for the vacation of the streets.

We find nothing in the agreement which indicates that the city will grant the petition or that the laws relating to vacation of streets will not be observed. We agree with relators that an agreement on the part of the city to vacate the streets, irrespective of the evidence that may be presented at the hearing on vacation, would be ultra vires and void. As we read the questioned section of the agreement, it does not fall within the ambit of the stated rule.

We find no merit in the contention that the city council, by §13 of the agreement, has agreed to vacate the streets upon the filing of a petition and to disregard the law relative to vacation of city streets.

The judgment of the trial court declaring ordinance No. C17494 to be null and void is reversed, and the cause remanded with instructions to enter judgment sustaining the validity of the ordinance, in accordance with the views herein expressed.

HILL and HUNTER, JJ., and WARD, J. Pro Tem., concur.

ROSELLINI, J. (dissenting)—I would sustain the trial court's finding that the action of the Plan Commission in approving the rezoning requested by the intervenors was arbitrary and capricious. As the trial court pointed out, there was no evidence that the population of the area was growing; the evidence was that it had stabilized. The evidence did not show that the shopping center was needed; the most the evidence showed was that it could be supported.

Zoning is tolerable to the property owner because although he gives up a valuable freedom in the use of his property, he is compensated by a certain assurance of stability in the character of his environs. Those who administer the zoning laws have, therefore, a responsibility to see that this stability is preserved until necessity and good planning demand that the character of the neighborhood be altered.

The comprehensive zoning ordinance provides (Sec. 320.10) that if the City Council finds an amendment is of

public necessity, benefits the general welfare of the community, or constitutes good zoning practice, it may amend the ordinance accordingly.

While the formal recommendation of the Plan Commission may indicate that it made such supportive findings, the record does not show that the members of the council, exercising their independent judgment, were in agreement. The trial court concluded that the remarks of the councilmen indicated the uncertainty of the factual basis of the recommendation. I quote from the memorandum opinion.

The question is not whether or not a shopping center could be financially successful, but whether it is a public necessity of such magnitude so as to justify a rezoning, which amounts to the taking of property without the payment of compensation insofar as nearby home owners are concerned.

In the court's opinion, the competent evidence of the facts necessary to be proved is insufficient to support a jury verdict favoring rezoning were this case triable to a jury.

After discussing the lack of findings and the statements of the councilmen voting in favor of the rezoning, the trial court said:

These were the four votes in favor of the rezoning. It is obvious from the remarks of the Councilmen that the motivation and reasoning upon which they based their votes was not concerned with necessity and good zoning practice, but upon the desire to close a controversy.

Councilman Jones was the only member who commented on the merits. He said that an area zoned R1 should remain R1 unless there were compelling and unusual reasons for a change. The need for a shopping center was less in 1962 than in prior years, the City was undergoing a decline in population and that there was no reason to further dilute the trade dollars in the area. There being no compelling or unusual reason for a change, the area should remain R1. He voted against the rezoning.

Councilman Johnson voted against the rezoning without comment.

As the trial court said, in legislating a zone change, a city council has the duty to do so only for pertinent reasons;

that is, because such zone change benefits the general welfare of the community and is of public necessity, or constitutes good zoning practice. There were no findings that such reasons existed, and had there been such findings, they would not have been supported by the record.

This rezoning will have an adverse effect on the property of adjacent residents. The courts have upheld the validity of zoning ordinances in spite of the fact that they do affect property values and restrict use of property, because of their compensating benefit to all the property involved and to the public welfare in general. It is therefore important that these factors not be disregarded when zoning changes are made; otherwise the justification for the permitted invasion of private property interests disappears. See 58 Am. Jur. *Zoning* § 16 (1948)

In cases of this kind it is axiomatic that the court may not substitute its judgment for that of the legislative body. The action of a city council will be sustained if the council acted upon due consideration of the facts, even though the court may believe that an erroneous conclusion has been reached. But where, as here, the facts do not support a finding that the public welfare would be served by a zoning change, or that necessity demands it, and no such finding was actually made by the council, I believe the court has the duty to set aside the ordinance as arbitrary and capricious. This court has held that it is warranted in setting aside such a determination if it is arbitrary and constitutes an abuse of discretion. *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee,* 50 Wn.2d 378, 312 P. 2d 195 (1957).

I would affirm the trial court.