[No. 2083–2. Division Two. May 13, 1977.]

CHARLES R. ULLOCK, *Appellant,* v. THE CITY OF BREMERTON, ET AL, *Respondents.*

*Philip M. Best,* for appellant.

*Bishop, Cunningham & Costello, John A. Bishop, Walgren, Sexton & McCluskey, Inc., P.S., Gary Sexton, Shiers, Kruse, Wallace & Kamps, Frank A. Shiers,* and *Steven R. Buzzard,* for respondents.

PEARSON, J.—This appeal challenges a zoning action of the City of Bremerton affecting 5 acres of undeveloped land owned by the Bremerton Elks Club. The petition by the Elks Club sought less restrictive zoning classifications for the property, but the petition was not accompanied by a specific development project. The Elks Club intended to sell the property after the zoning action.

Appellant, a residential property owner who lived near the subject property, objected to the petition on environmental grounds. After preparation of an environmental impact statement (EIS) and after two public hearings, the City Planning Commission rendered a written decision denying the zoning petition. This decision was reversed on appeal to the City Council and the petition granted. The Superior Court affirmed.

Two primary issues are raised on appeal. (1) For purposes of a nonproject zoning action, is an EIS adequate where it deals with the environmental consequences in a general way, emphasizing maximum potential development, but does not consider the environmental consequences of the various specific uses allowable under the various zoning classifications in question? (2) Where the EIS specifies several major adverse environmental consequences to *any* development and concludes

> Through proper design it is possible to reduce the magnitude of these adverse effects substantially. However, in that no plans have been submitted for the development of this site, any measures that may be taken to diminish and make less severe those adverse environmental effects are unknown . . .

does the zoning action taken violate the substantive environmental policy of RCW 43.21C, "State Environmental Policy Act of 1971," (SEPA)?

The first question is procedural, in that it involves the statutory adequacy of an environmental impact statement where the major action is a nonproject zoning action. The second question is substantive, involving the authority of the court to review the ultimate zoning decision of the legislative authority for which the impact statement was prepared.

The appeal also raises two other issues, one involving the absence of a verbatim transcript of one meeting of the Planning Commission, and the other challenging the authority of the City Council under its zoning ordinance to reverse the decision of the Planning Commission. We affirm.

The Elks Club acquired the property for the purpose of constructing a lodge facility. It was originally zoned R–1, which would allow one– or two–family dwellings, libraries, art galleries, playgrounds, and accessory buildings. An R–2 zone was allowed, contingent upon the Elks Club's using the site for construction of a lodge facility. The R–2 zone would allow all R–1 uses, plus lodges, apartment houses, hotels, churches, schools, hospitals, and the like. When the Elks Club determined that it was not feasible to construct a lodge facility on the site, the zoning reverted to R–1 uses.

In contemplation of selling the property, the Elks Club divided the property for zoning application purposes. A triangular section on the northwest of the property containing approximately 2 acres of the flattest and most accessible land was earmarked in the petition to be rezoned from R–1 to R–2. This acreage was immediately adjacent to R–1

zoned and developed property. A larger tract of approximately 3 acres lies to the southeast of the other 2 acres, and consists largely of a steep slope of some 250 feet in width, bordering on and lying above state Highway 21 on Kitsap Way, a major arterial through Bremerton. The petition sought to have this tract rezoned from R–1 to B–3. The B–3 zone would allow all R–1 and R–2 (some 16) uses, plus some 40 other commercial uses such as retail stores, restaurants, service stations, office buildings, taverns and the like. Other commercial uses are permitted at various other points along both sides of Kitsap Way. While plaintiff's brief suggests to the contrary, we find nothing in the record which suggests that the proposed rezoning is inconsistent with the comprehensive plan developed for the City of Bremerton for this general area.

The environmental impact statement was prepared by the Planning Commission staff at the direction of the Planning Commission. The first draft of the environmental impact statement, as amended by the comments of those agencies[1] that responded to its circulation, is critical of any development in the area, particularly the steep slope which parallels Kitsap Way, drains into Oyster Bay of Puget Sound, and accounts for approximately half of the 5–acre tract.

The problems with development of the property, according to the environmental impact statement, are an unfavorable slope, a seasonal high water table, and soil which is not permeable. For these reasons, denuding the property of the vegetation cover, as many developments might require, would cause soil erosion and potential pollution of Oyster Bay, into which the property drains. There are no sewer facilities.[2] These comments appear in the environmental

[1]Some 17 agencies were sent copies of the first draft of the environmental impact statement.

[2]The engineering department of the city reported that a sanitary service LID was in process and would serve the property "at such time that financing permits construction."

impact statement and support its ultimate conclusion:

Depending on the level of development of the site, varying from no development to full coverage of the property, with impervious surfaces, such as buildings and parking areas, the amounts of storm water runoff will vary from approximately 600 to 1650 gallons per minute. As the quantity of surfaced area increases and the levels of runoff also increase, so will the pollution level of that runoff increase.

. . .

. . . Obviously, the removal of any vegetation will substantially increase the erosion hazard, and the possibility of down slope property damage.

. . .

Although it is recognized that this area is not a large tract of natural habitat, it is nevertheless important due to its location. The five acre site being situated within the urban area, lends an air of the natural environment to an otherwise intensive urban atmosphere, offering pleasant relief to both the passerby and nearby residents.

. . .

Being located so close to Oyster Bay, this buffer of natural environment has lessened the impact of the surrounding urban development on that water body.

. . .

Partial or full removal of a natural stand of trees along this heavily traveled state highway would substantially increase the distance to which noise and light, from that highway, would penetrate the residential neighborhood lying north of the property.

. . .

Should the property along Kitsap Way be rezoned commercial, it is not known where the ingress and egress to these commercial establishments will be made. The steep slope immediately adjacent to and running parallel to Kitsap Way, would not permit vehicular ingress and egress.

Section D of the report specified six major unavoidable adverse environmental effects would result from the general development alternatives under the proposed zone change, concluding:

Through proper design it is possible to reduce the magnitude of these adverse effects substantially. However, in that no plans have been submitted for the development of this site, any measures that may be taken to diminish and make less severe those adverse environmental effects are unknown.

Responses from the solicited agencies varied. Several stated the matter to be of local concern. Others stated no objections to the rezone. Those responses which were critical of the rezone based their objections upon the various adverse environmental factors mentioned in the draft environmental impact statement.

The Planning Commission furnished these reasons for denial of the rezone petitions:

(1) It is not possible to assess the impact of any future development without a site plan showing location of proposed buildings, roads, and other pertinent information.

(2) The physical condition of the property on which the Environmental Impact Statement was written has changed substantially because of the grading and fill that has taken place as a part of the construction of a road through the property.[3]

(3) The Environmental Impact Statement was critical of development on the steep slope. The slope of the property exceeds 20%.

(4) Soils Study indicates that soils at the site exhibit moderate potential for slippage and severe hazard for erosion.

At the hearing before the City Council, the clerk read the environmental impact statement to the Council, together with the written responses of the government agencies, and both proponents and opponents were allowed to speak. The opposition to the petition centered on the absence of a site development plan. The City Council was advised by its attorney that not only would another environmental impact statement be required before a project could be approved, but also that a public hearing could be required before a

---

[3]Evidence showed that the adjacent property owner owning a road easement across a portion of the property commenced building a road without proper authorization. The project was stopped short of completion of the road.

building permit was issued. This summary appears in the minutes of the City Council meeting of October 31, 1973. "Further discussion was held and it was the consensus of the Council that the site plan and EIS would be properly handled by the building department before development of the property." The rezoning petitions were unanimously approved and ordinances later adopted to change the zoning on the two tracts of land.

The findings of fact of the trial court largely recite the facts and procedures set forth above. The court concluded, among other things, (1) that the environmental impact statement was drafted and adopted in substantial compliance with RCW 43.21C.030(2)(c) and (d); (2) the decision was not arbitrary or capricious, nor based upon faulty legal advice. We agree with these conclusions and affirm the zoning action.

We consider first the adequacy of the EIS as it relates to a nonproject zoning action. In *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 525 P.2d 774 (1974), a majority of the Supreme Court held that the adequacy question is one of law, subject to de novo review by the courts. The test to be applied is "'"whether the environmental effects of the proposed action and reasonable alternatives are sufficiently disclosed, discussed and that they are substantiated by supportive opinion and data."'" *Leschi Improvement Council v. State Highway Comm'n, supra* at 286. We shall attempt to analyze the criticisms of the EIS in light of this test and in light of the nature of the proposed action.

The challenge to the EIS in the case at bench centered around (1) the absence of a site plan and the statement in the EIS that without a site plan the environmental consequences could not be measured; and (2) the omission of a consideration of specific alternative uses to which the property might be put under the various zoning classifications. RCW 43.21C.030(2)(c)(iii).

Under the test set forth above, neither of these challenges is sufficiently meritorious to defeat the adequacy of

the EIS. Unlike an administrative decision to proceed with highway construction or to issue a construction permit, a nonproject zoning action has no immediate or measurable environmental consequences. It is a legislative action designed to accomplish permissible changes in land use. It would be unreasonable to require every rezoning petition to be accompanied by a site plan solely to generate exact environmental consequence information. Such a requirement would frustrate efforts of municipalities to bring zoning laws into conformity with comprehensive plans for development of their city. It would also unduly penalize a property owner who seeks a more valuable, higher use of his property for purposes of enhancing its marketability— as for example property which has little or no value under the prevailing uses. It would also make zoning changes depend upon development projects, rather than desirable long range planning.

It would be totally impractical and unreasonable to require the EIS to consider alternatively the environmental consequences of 16 uses permitted under the R–2 zone or the 40 uses permitted under the B–3 zone, when no specific project is under consideration. *See Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 552 P.2d 184 (1976), holding that *the rule of reason must be applied in reviewing adequacy of an EIS.*

Where the major action involves a nonproject zoning change, more flexibility is required to achieve substantial compliance with SEPA. We hold that an EIS is adequate in a nonproject zoning action where the environmental consequences are discussed in terms of the maximum potential development of the property under the various zoning classifications allowed.[4]

----

[4]The flexibility which this rule would allow is now provided for by guidelines adopted by the Council on Environmental Policy and published subsequent to the City Council's action in this case. WAC 197–10–442.

582

The EIS prepared in this case contained a reasonably thorough discussion of the significant aspects of the environmental consequences of *any* development of the property. As such, the adverse as well as the beneficial consequences could be generally applied to the various uses permitted under the less restrictive zones, as well as to those uses allowed under the existing R–1 zone. *See Cheney v. Mountlake Terrace, supra.*

■ The more difficult question is whether the courts should interfere with the zoning change in view of the contents of the EIS. It is well settled law that zoning is a discretionary exercise of police power by a legislative authority. *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 422 P.2d 790 (1967). In reviewing legislative action the courts have traditionally exercised judicial restraint because of the separation of powers doctrine.[5] Review is limited to a determination of whether the zoning legislation satisfies constitutional requirements and a determination as to whether the decision made is arbitrary and capricious or ultra vires. *State ex rel. Randall v. Snohomish County,* 79 Wn.2d 619, 488 P.2d 511 (1971).

There is no constitutional challenge to the zoning action in question. Obviously then, we are left with a determination of (1) whether the zoning action is contrary to the substantive policies of SEPA as a matter of law, or (2) whether it was arbitrary and capricious, *i.e.,* rendered without consideration and in disregard of the facts.[6] *See Anderson v. Island County,* 81 Wn.2d 312, 501 P.2d 594 (1972) where the general test for determining when an action is arbitrary and capricious is stated to be whether

[5]Under SEPA the doctrine of judicial restraint is recognized by the admonition in RCW 43.21C.090 that the decision of the governmental agency must be accorded substantial weight.

[6]The "clearly erroneous" test has recently been added as a standard of review in cases where there has been a negative threshold determination of the need for an EIS. *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976) (modifying *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974)).

reasonable minds could differ in finding a substantial relationship between the zoning action and the public health, safety, morals or general welfare.

■■■ The zoning action here is not contrary to the substantive policies of SEPA as a matter of law. The zoning action itself will have no immediate environmental consequences. The decision of the Council to proceed with the rezone in view of the adverse environmental consequences of *any* development of the property described in the EIS amounted to a legislative decision to delay full implementation of SEPA until the project stage. This decision does not violate SEPA as a matter of law, so long as the Council retains the authority to implement those environmental policies at the project stage. The Bremerton City Council was advised by their counsel that it did have the legal authority to require an EIS at the project stage. This was proper advice. It is now settled that the City can and must require an environmental impact statement at the development permit stage, where a major action is contemplated which significantly affects the quality of the environment. *See Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974); *Juanita Bay Valley Com. Ass'n v. Kirkland,* 9 Wn. App. 59, 510 P.2d 1140 (1973). And the City Council here evidenced an intention to require such an additional EIS at the project stage.

Furthermore, zoning laws do not establish vested rights until the building permit has been sought and issued, and the application must be consistent with the zoning ordinance. *Eastlake Com. Council v. Roanoke Ass'n,* 82 Wn.2d 475, 513 P.2d 36, 76 A.L.R.3d 360 (1973). Accordingly, the policies of SEPA can and must be fully implemented at the development permit stage. *See Juanita Bay Valley Com. Ass'n v. Kirkland, supra.*

Subsequent to the action taken in this case, categorical exemptions from SEPA requirements have been authorized by RCW 43.21C.070 and implemented by WAC 197–10–170. Many of those exemptions would apply to the zoning

uses authorized in all the zoning classifications under consideration here, both under the existing R–1 zone and the R–2 or B–3 zones. However, the current regulation also empowers counties and cities to create "environmentally sensitive areas" to which most of the categorical exemptions do not apply—including, but not limited to, areas with unstable soils, steep slopes, unusual or unique flora or fauna, or areas which lie within floodplains. WAC 197–10–177. This will allow cities and counties some flexibility to implement SEPA policies in areas such as those described by the EIS in this case, even though the project is a modest or minor development.

We conclude and hold that a nonproject zoning action by a municipality does not violate SEPA as a matter of law solely because the municipality determines to delay full implementation of the environmental policies of SEPA until the development permit stage, so long as the municipality has the authority to implement those policies at the permit stage and so long as the environmental consequences of any development of the property are disclosed and considered at the time the zoning action is taken. *Narrowsview Preservation Ass'n v. Tacoma, supra.*

We turn next to the question of whether the zoning action was arbitrary and capricious. The answer will depend largely upon whether environmental factors were considered here to the extent possible in a nonproject zoning action. We conclude that reasonable minds could differ in finding a substantial relation between the zoning action of the City Council and the environmental consequences of such action. *Anderson v. Island County, supra.*

It seems evident that if a particular governmental action were to result in severe environmental consequences and there were no other important beneficial consequences against which to balance them, the courts would be warranted in holding the action to be either ultra vires or arbitrary and capricious and violative of the substantive polices of SEPA. *See Eastlake Com. Council v. Roanoke Ass'n, supra.*

But we have already stated that this zoning action will have no immediate environmental consequences, and without a development project at issue no real balancing process is possible. The EIS recognizes this obvious fact. Further, it would be unreasonable to condition zoning changes on development plans. Such would frustrate cities and counties in their attempts to implement comprehensive plans. The development permit stage is a more appropriate stage for the governmental agency to fully implement SEPA.

The City Council apparently considered the SEPA policies to the extent possible in a nonproject zoning action. The physical and environmental limitations and benefits to any development of the property were described at length in the EIS. It is evident from the detailed statement that the physical limitations and environmental consequences of any development of the property applied with equal force whether or not the zone change was made. In this light, what was stated in *Narrowsview Preservation Ass'n v. Tacoma, supra* at 424 applies here:

It is entirely consistent for government to determine that a change in the zoning would not have a substantial impact on the environment, based upon the information available, when examined in relation to those uses already allowed by existing zoning and yet to require an environmental impact statement at such time as a preliminary plat or building permit was issued for a specific project when details of the specific structure and use of the property are more clearly defined.

Given this set of circumstances, we conclude the decision was not arbitrary or capricious in the defined sense. It is conceivable that a well–designed project or projects which might be applied for in the future under the less restrictive zoning would have lesser adverse environmental consequences than would residential development which might occur under the more restrictive zoning.

We note the zoning action does coincide with the Bremerton Comprehensive Plan. The B–3 zone borders on a heavily–traveled, business–zoned state highway, along which many B–3 zone uses are already in existence. That

property will be separated from R–1 zoning by an area zoned R–2. We also note that the Council considered the text of the EIS and the opinions of the numerous affected agencies. A full hearing was held. The only opposition centered around the question of whether the zoning action should be denied in the absence of a specific project. In view of all these circumstances, arbitrary or capricious action has not been demonstrated.

Two other issues remain for consideration. The first has to do with the absence of a verbatim transcript of the September 19, 1973, Planning Commission meeting. The record contains verbatim transcripts of all proceedings before the City Council and the Planning Commission except one of the latter's meetings, at which the tape recorder malfunctioned. In *Barrie v. Kitsap County,* 84 Wn.2d 579, 527 P.2d 1377 (1974), the court held that verbatim records are required of rezone hearings initiated after November 21, 1974. The requirement prior to *Barrie* was that the record must be sufficient to permit adequate and intelligent review. *Loveless v. Yantis,* 82 Wn.2d 754, 513 P.2d 1023 (1973). Given the substance of the September 19, 1973, meeting and the detailed notes available, adequate and intelligent review is possible.

Finally, it is contended that the City Council exceeded its authority by "reversing" the Planning Commission decision to deny the rezoning petitions. This argument is bottomed on the premise that the zoning ordinance provides only that the City Council may "affirm, modify or disaffirm" the decision of the Planning Commission. Absent a specific authority to "reverse," it is argued, the Council exceeded its authority in granting the petitions to rezone. It is true that the City Council is required to follow the procedural provisions of its zoning ordinance. But at the same time it cannot delegate its legislative rezoning authority to its Planning Commission. *See Lutz v. Longview,* 83 Wn.2d 566, 520 P.2d 1374 (1974). Aside from the question of whether plaintiff's asserted interpretation of the phrase "affirm, modify or disaffirm" would result in an unlawful

delegation of its legislative authority, this assignment of error has little merit. The term "disaffirm" in the context of a denial of a zoning request would have no meaning unless the Council was authorized to grant the petitions to rezone. Furthermore, to the extent the phrase is ambiguous, we prefer to accept the interpretation of the legislative authority which adopted it, particularly if that interpretation more fully carries out its nondelegable legislative zoning authority. *See Morin v. Johnson,* 49 Wn.2d 275, 300 P.2d 569 (1956). We reject various other matters raised by plaintiff; they were either not brought.to the attention of the City Council at the hearing, or they have no merit.

Judgment affirmed.

FARRIS, J., and RINGOLD, J. Pro Tem., concur.

Petition for rehearing denied July 12, 1977.

Review denied by Supreme Court December 16, 1977.