[No. 12951–5–II.  Division Two.  December 10, 1990.]

MARANATHA MINING, INC., ET AL, *Appellants,* v. PIERCE COUNTY, ET AL, *Respondents.*

---

*William T. Lynn, Stephanie A. Arend,* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* for appellants.

*John W. Ladenburg, Prosecuting Attorney,* and *Stephen R. Shelton, Deputy,* for respondent Pierce County.

*Joseph F. Quinn* and *McCormick, Hoffman, Rees, Faubion, Quinn & Van Buskirk, P.S.,* for respondents Sunnen, et al.

WORSWICK, J.—We reverse the Pierce County Council's denial of Maranatha Mining's[1] application for an unclassified use permit to operate a surface gravel mine and asphalt plant, and we direct that the permit be issued.

Maranatha owns a 60–acre parcel in a general use zone near McMillan on which it wants to conduct gravel mining and asphalt manufacturing. Such uses are permitted in general use zones under unclassified use permits. The first hearing on Maranatha's permit application took place on December 20, 1985, before a hearing examiner who considered a multitude of exhibits and heard several experts testify in favor of the application. A number of citizen-opponents testified concerning expected adverse effects. Draft and final environmental impact statements had been prepared and submitted to the examiner. A staff report from the Pierce County Planning Division had recommended denial of the permit, and the hearing examiner did initially deny it, entering required findings of facts and conclusions of law.

On Maranatha's appeal, the Pierce County Council remanded the matter to the hearing examiner with instructions to entertain further specific testimony on four issues: (1) traffic; (2) dust problems; (3) potential groundwater

---

[1]The applicants were Maranatha Mining, Inc., and Tucci & Sons, Inc., joint venturers. We will refer only to Maranatha.

contamination; and (4) effects on a commercial fish hatchery adjacent to the site. The Council also instructed the examiner to specify appropriate conditions on the permit to mitigate any problems.

The hearing examiner concluded a second public hearing in August 1986, having taken evidence on all the issues referred by the Council. That evidence included expert testimony that the groundwater would not be affected, and a lengthy presentation by Maranatha's attorney, who used various exhibits to show how the Council's concerns had been or could be mitigated. Several area residents again spoke against the application, challenging many of the expert conclusions, but offering little concrete evidence[2] and no expert testimony of their own.

Following this hearing, the examiner made amended findings and a decision that the permit should be issued, subject to 31 conditions.[3] The examiner's amended findings and conclusions stated that Maranatha had "met or mitigated the conditions that governed the initial decision."[4]

The County Council reviewed the examiner's second decision at a public hearing November 18, 1986. The attorney for a group of opponents commented that perhaps it would "take a fatality between a gravel truck and a school

---

[2] The only specific evidence offered consisted of two letters detailing near accidents caused by gravel trucks on McCutcheon Road, at least one of which took place *north* of the site. One of the examiner's conditions for issuing the permit is that trucks not be permitted to use McCutcheon Road to the north of the site.

[3] The examiner adopted these conditions from the July 29, 1986, supplemental staff report prepared for him by the Pierce County Planning Division.

[4] The record supports this statement. On the traffic concern, Maranatha offered to improve the main road affected by bringing it up to county standards, to limit the number of truck trips per day, and to delay operations until a bridge in question was replaced. Maranatha also supplied a long list of measures to mitigate dust at the site including a paved access road and watering procedures. Their experts presented testimony that groundwater would not be contaminated, and no opposing expert testimony was presented. Officials from the fish hatchery located adjacent to the site advised by letter that the surface mine would not adversely affect their operations.

bus" before the Council would deny the permit. Occasionally, the audience interrupted the proceedings with emotional outbursts concerning the safety of school children and the degree to which the project would diminish the quality of life of area residents. Finally, one of the Council members spoke out about her knowledge of the site, her personal feelings that the permit application should be denied, and her concerns about Maranatha's ability to comply with the conditions. The Council denied the permit.

The Council made no findings of fact, but set forth its reasons in a resolution reading only, in relevant part:

> WHEREAS, the Pierce County Council held a public hearing on the 18th day of November, 1986, and heard and considered all relevant testimony presented regarding the applicant's request; and
> WHEREAS, the Deputy Hearing Examiner recommended approval of the permit request subject to strict compliance with thirty–one separate conditions; and
> WHEREAS, the Pierce County Council determined that traffic noise and aesthetic impacts could not be mitigated, and that severe safety issues were presented; and
> WHEREAS, the Pierce County Council has concluded that the granting of the permit is not [sic] in the public health, safety, and welfare of the citizens Pierce County;
> NOW, THEREFORE, BE IT RESOLVED by the Council of Pierce County:
> Section 1. That having reviewed the entire record of the Hearing Examiner, and hearing testimony of all parties present at the hearing, the Pierce County Council hereby denies the applicant's request for an Unclassified Use Permit.

Maranatha comes to us following the Superior Court's affirmance of the Council's action.[5]

Maranatha's main contentions in this appeal concern the Council's failure to make findings of fact supporting its decision, and the appropriate standard to be applied to our review. As to that standard, Maranatha contends that the Council denied the permit for environmental reasons, so its

---

[5]In this case, we review the record before the Council and do not rely on findings of fact or conclusions of law entered by the Superior Court. *Balser Invs., Inc. v. Snohomish Cy.*, 59 Wn. App. 29, 795 P.2d 753 (1990); *Grader v. Lynnwood*, 45 Wn. App. 876, 879, 728 P.2d 1057 (1986).

decision falls under RCW 43.21C, the State Environmental Policy Act of 1971 (SEPA), and must be reviewed under the clearly erroneous standard. *See Cougar Mt. Assocs. v. King Cy.,* 111 Wn.2d 742, 765 P.2d 264 (1988). The County argues that the denial was not based solely on environmental grounds, but also on the broad constitutional grant of police power to implement and enforce zoning regulations, reviewable under the arbitrary and capricious standard. *See Ullock v. Bremerton,* 17 Wn. App. 573, 582, 565 P.2d 1179, *review denied,* 89 Wn.2d 1011 (1977). Both sides seem to assume that the Council was required to make findings of fact, with Maranatha arguing that it did not and the County asserting that it did. We conclude that the Council did not make findings. We also conclude, however, that it was not required to make findings, although its failure to do so made inevitable our decision to require issuance of the permit. Further, we need not decide whether and to what extent SEPA supersedes the Council's police power, because we conclude that the Council's decision cannot survive scrutiny under either the clearly erroneous or the arbitrary and capricious test.

■ We must begin our analysis by examining Pierce County's procedure for handling applications for unclassified use permits in light of the law authorizing that procedure. The County uses a hearing examiner system, which is authorized by RCW 36.70.970. That statute provides in part:

> Each county legislative authority electing to use a hearing examiner pursuant to this section shall by ordinance specify the legal effect of the decisions made by the examiner. Such legal effect may vary for the different classes of applications decided by the examiner but shall include one of the following:
> (1) The decision may be given the effect of a recommendation to the legislative authority;
> (2) The decision may be given the effect of an administrative decision appealable within a specified time limit to the legislative authority.

It can quickly be seen that this authorizing statute requires the County to settle on but one of two choices: whether its

Council will be the decisionmaker, confining the examiner's authority to recommendations, or whether the examiner will be the decisionmaker with the Council in an appellate role.[6] If the examiner's decision constitutes a recommendation only, the Council may substitute its judgment for that of the examiner on all issues. *See, e.g., Rosales v. Department of Labor & Indus.*, 40 Wn. App. 712, 715, 700 P.2d 748 (1985); *West Slope Comm'ty Coun. v. Tacoma*, 18 Wn. App. 328, 337–38, 569 P.2d 1183 (1977), *review denied*, 89 Wn.2d 1016 (1978). If, on the other hand, the Council acts only as an appellate body with its determination based solely on the original record, it is not empowered to substitute its judgment for that of the examiner, and it must sustain the examiner's findings of fact if they are supported by substantial evidence. *See Messer v. Snohomish Cy. Bd. of Adj.*, 19 Wn. App. 780, 787, 578 P.2d 50 (1978).

The Pierce County Code authorizes the examiner to consider applications for unclassified use permits in general use zones, and to grant them for proposed uses that are consistent with the purpose and intent of the Comprehensive Plan, land use management programs, and the spirit and intent of the Code, and for uses that are not "unreasonably incompatible" with the uses permitted in the surrounding areas. Pierce County Code (PCC) 18.10.390(A); .620(A). The examiner's decision on an unclassified use permit is "final and conclusive but is subject to Appeal [*sic*] to the Council". PCC 18.10.680(D)(9). The Council's decision on an appeal must be based on the record of the hearing held by the examiner, although the Council may request additional information from the appellant or the examiner. It may adopt, amend and adopt, reject, reverse, amend and reverse the findings, conclusion, and decision of the examiner, or remand the matter for further consideration. PCC 18.10.680(E)(2)(d). If the matter is remanded, the Council must hold a hearing to consider the examiner's subsequent action and to make a final decision. PCC 18.10.680(F)(2).

---

[6]The statute does not authorize a combination of these choices.

■■ Although the provisions permitting the Council to take additional evidence and providing for automatic review after a remand suggest an impermissible attempt to incorporate aspects of both the alternatives provided in RCW 36.70.970, the Council appears to have opted for an appellate, rather than a primary decision–making role.[7] It is the general rule that if an administrative body does not sit in a fact–finding capacity, it has no obligation to enter findings of fact and conclusions of law. *Pentagram Corp. v. Seattle,* 28 Wn. App. 219, 229, 622 P.2d 892 (1981). The Pierce County Code provides, however, that if the Council ultimately decides to amend or reverse the examiner, it must "prepare a written decision giving [its] findings of fact and conclusions *insofar as they may differ from those of the Examiner.*" (Italics ours). PCC 18.10.680(E)(2)(e). It follows, under the general law coupled with the specifics of the Pierce County Code, that the Council was not required to make findings unless it disagreed with the examiner's. It also follows that because the Council did not make findings, it did not disagree with the examiner's findings and is, therefore, bound by them.

The general statement in the Council's resolution denying the permit, that traffic noise and aesthetic impacts could not be mitigated and that severe safety issues were presented, is not a finding, but a conclusion. The examiner's findings concerning the adverse effects of the proposed use (original findings) and the proposed mitigation measures (amended finding 3 and the conditions listed in conclusion 4) are established as verities. The Council simply disagreed with the examiner's conclusion that the proposed conditions would effectively mitigate those effects.[8]

---

[7]The Council's attorney advised it at the beginning of the second hearing that the Council was sitting as a "reviewing court."

[8]This conclusion is denominated amended finding 5, stating:

"The basis for the final recommendation is that Maranatha Mining, Inc. has met or mitigated the conditions that governed the initial decision. This recommendation is, therefore, based on the conditions of approval, and if the Pierce

The dispositive issue presented on this appeal, then, is whether the Council's conclusions and decision are supported *by the examiner's findings*. They are not.

■ To the extent that SEPA review standards apply, the Council's decision was beyond being clearly erroneous; it was entirely without legal support and therefore erroneous as a matter of law. Under SEPA, such a decision must be based on "policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency".[9] RCW 43.21C.060; PCC 17.08.170(C); *Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d at 752. Further, the Council was required to find that (1) the proposal would result in significant adverse impacts identified in the final EIS, and (2) that reasonable mitigation measures would be insufficient to mitigate the identified impact. RCW 43.21C.060; WAC 197-11-660(1)(f); *Cougar Mt. Assocs. v. King Cy., supra.* The Council failed utterly to follow these requirements, identifying neither the related policies nor the reasons that the proposed mitigation measures were insufficient. Moreover, it could not have done so.

■■ The final EIS, dated October 1985, listed several "significant adverse impacts that cannot be mitigated."[10]

---

County Council grants the request, it is recommended that such action be conditioned on strict compliance with all conditions contained herein."

[9]The four concerns that the Council expressed in its original remand (traffic, dust particulates, groundwater contamination, and effects on the fish hatchery) as well as the "traffic noise" and "aesthetics" concerns stated in the denial resolution are all "elements of the environment" that can be addressed in environmental impact statements under SEPA rules. WAC 197-11-444. Arguably, the Council placed itself in SEPA's path. SEPA declares that its policies and goals are "supplementary to those set forth in existing authorizations of all branches of government . . . including . . . counties." RCW 43.21C.060.

[10]These are: Change in topography, increase in particulates (dust) and odor, partial loss of habitat and reduction/relocation of wildlife using site, intermittent increase in daytime noise levels adjacent to the site, visual aesthetic impact on three residences north of the site, additional truck traffic to and from the site, short-term noise and dust impacts during construction of county road improvements.

Before listing these impacts, however, the EIS listed the proposed measures that would alleviate many of them.[11] The law does not require that all adverse impacts be eliminated; if it did, no change in land use would ever be possible. *Cf. Cougar Mountain,* 111 Wn.2d at 753. ("SEPA seeks to achieve balance, restraint and control rather than to preclude all development whatsoever.") The only expert testimony in the record shows that the mitigation measures would prevent groundwater contamination. The fish hatchery operators advised that the project would not affect their operations. The examiner's findings show that Maranatha's proposals would mitigate the impact of dust particulates. The draft EIS stated that proposed improvements to roads and a bridge in the area would allow for "safe and comfortable" travel on affected roads. The only opposing evidence was generalized complaints from displeased citizens. Community displeasure cannot be the basis of a permit denial. *Kenart & Assocs. v. Skagit Cy.,* 37 Wn. App. 295, 303, 680 P.2d 439, *review denied,* 101 Wn.2d 1021 (1984).

To the extent that the Council's decision was an exercise of police power, reviewable under the arbitrary and capricious standard, the Council's denial of the permit presents a textbook example of arbitrary and capricious action: without consideration and in disregard of the facts. *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 210, 422 P.2d 790 (1967). A decision of this sort must be controlled by adequate standards. *State ex rel. Standard Mining & Dev. Corp. v. Auburn,* 82 Wn.2d 321, 327, 510 P.2d 647 (1973). Here, although the County claims that it has established "specific standards and criteria" to guide the discretion of both the hearing examiner and the Council in making these decisions, it does not tell us what they are,

---

[11]Some of the listed impacts, such as change in topography and reduction/relocation of wildlife using site, are impacts present in any land use, even building a residential dwelling.

and our examination of the record and the pertinent Code provisions reveals none.[12]

It is apparent that the Council gave little consideration to the merits of Maranatha's application, and that it disregarded the facts set forth in the examiner's findings. The Council seems to have heard clearly the citizen complaints and the comments of one of its own members[13] while disregarding the record. We cannot escape the conclusion, in view of the evidence in support of Maranatha's application, that the Council based its decision on community displeasure and not on reasons backed by policies and standards as the law requires. Further, if the Council is concerned with Maranatha's ability to comply with the 31 conditions that the examiner placed on the permit, the proper remedy is to monitor the operation (for which the conditions provide) and to withdraw the permit in the event of noncompliance. It is improper to deny the permit to an applicant who, throughout the application process, has demonstrated a willingness to mitigate any and every legitimate problem.

Given the posture of this case, it would be pointless to remand for further Council proceedings, for the examiner's findings and the controlling law will support nothing other than issuance of the permit. Accordingly, we reverse and remand with instructions to grant the permit in accordance with the examiner's decision, including the conditions specified by the examiner. *Cf. Nagatani Bros., Inc. v. Skagit Cy. Bd. of Comm'rs*, 108 Wn.2d 477, 483, 739 P.2d 696 (1987) (modifying Court of Appeals mandate by

---

[12]For the kinds of standards that a court has found adequate for the reviewing imposition of conditions on a permit, see *State ex rel. Standard Mining & Dev. Corp.*, 82 Wn.2d at 331 n.4, which quotes extensively from the *Comprehensive Plan for Auburn Planning Area* (Sept. 1968).

[13]The Supreme Court has soundly criticized such comments by board or council members when testimony at the public hearing was closed but before the decision had been made. *Nagatani Bros., Inc. v. Skagit Cy. Bd. of Comm'rs*, 108 Wn.2d 477, 482, 739 P.2d 696 (1987).

requiring plat approval and deleting alternative of additional findings).

ALEXANDER, C.J., concurs.

PETRICH, J. (dissenting)—I dissent from the majority's analysis of the appellate authority of the Pierce County Council. I agree that RCW 36.70.970 provides that the Council may reserve to itself either decision–making authority or appellate authority, and that the Council has chosen appellate authority. However, I disagree with the majority's assertion that having selected appellate authority, the Council "is not empowered to substitute its judgment for that of the examiner, and it must sustain the examiner's findings of fact if they are supported by substantial evidence." Majority, at 801. While such a standard for appellate review is correct for a court exercising appellate authority, it is not necessarily correct for a legislative or administrative body exercising appellate authority over a subordinate administrative decision.

> The general legal principles which apply to appeals from lower to higher courts do not apply to administrative review of administrative determinations. The scope and nature of an administrative appeal or review must be determined by the provisions of the statutes and ordinances which authorize them."

(Citations omitted.) *Messer v. Snohomish Cy. Bd. of Adj.*, 19 Wn. App. 780, 787, 578 P.2d 50 (1978). *See also Chaussee v. Snohomish Cy. Coun.*, 38 Wn. App. 630, 639–40, 689 P.2d 1084 (1984). RCW 36.70.970(2) provides that a county may make the decision of its hearing examiner "the effect of an administrative decision appealable within a specified time limit to the legislative authority." Pierce County Code 18.10.680(E)(2)(d) defines the Council's appellate authority:

> The council's decision on an Appeal of all land use matters may adopt, amend and adopt, reject, reverse, amend and reverse the findings, conclusion, and decision of the Examiner or remand the matter to the Examiner for further consideration. Any decision by the Council shall be based on the record of the hearing held by the Examiner; however, the Council may

by motion, request additional information of the appellant or the Examiner.

In my opinion, this ordinance clearly states that the Pierce County Council has reserved to itself the authority to perform a de novo review on the record of the examiner's hearing. The scope of the Council's authorized actions, from adoption through amendment to reversal or remand, is inconsistent with the majority's conclusion that the Council sits with only the authority to determine whether the examiner's findings are supported by the evidence.

I agree with the majority that the Council failed to comply with PCC 18.10.680(E)(2)(e):

> If the action of the Council on an Appeal of the decision of the Examiner is to amend or reverse the Examiner, the Council shall prepare a written decision giving [its] findings of fact and conclusions insofar as they may differ from those of the Examiner.

However, I disagree that "under the general law coupled with the specifics of the Pierce County Code", "because the Council did not make findings, it did not disagree with the examiner's findings and is, therefore, bound by them." Majority, at 802. While such a treatment of an unchallenged finding as a verity is a well–recognized principle of appellate law in this state, I believe it is inappropriate to engraft this principle on to the ordinances regulating the Council's appellate authority.[14] *Messer; Chaussee.* I believe the appropriate remedy for the Council's failure to make "findings of fact and conclusions insofar as they may differ from those of the Examiner" is to remand the matter to the Council for it to make such findings and conclusions *based on the record of the hearing held by the examiner.* I agree fully with the majority's holding that consideration of matters outside that record, particularly comments and "evidence" presented by members of the Council, is improper.

---

[14]It has, however, properly been applied to a court's review of the final findings made by the administrative or legislative authority. *Fuller v. Department of Empl. Sec.*, 52 Wn. App. 603, 605–06, 762 P.2d 367 (1988), *review denied,* 113 Wn.2d 1005 (1989).

If the council is unable to make findings and conclusions based on the record of the examiner's hearing, then it should grant the permit. While the majority may criticize a remand for the entry of findings as giving the Council "a second bite at the apple", I believe that it is more appropriate to do so than for this court to determine as a matter of law that there is no evidence in the record from which the Council could make appropriate findings and conclusions in support of a denial of the permit. I would remand this matter to the Pierce County Council for further proceedings consistent with this opinion, not with instructions to grant the permit.

Reconsideration denied February 15, 1991.