[No. 36177-9-II.   Division Two.   April 8, 2008.]

J.L. Storedahl & Sons, Inc., et al., *Appellants*, v. Clark County et al., *Respondents*.

*Alexander W. Mackie* and *Eric S. Merrifield* (of *Perkins Coie, LLP*) and *John L. Dentler*, for appellants.

*Arthur D. Curtis, Prosecuting Attorney*, and *E. Bronson Potter, Deputy*; and *Svend A. Brandt-Erichsen* (of *Heller Ehrman, LLP*); and *David T. McDonald* (of *David T. McDonald, PC*), for respondents.

*Timothy M. Harris* and *Andrew C. Cook* on behalf of Building Industry Association of Washington, amicus curiae.

¶1 BRIDGEWATER, J. — J.L. Storedahl & Sons, Inc., and Storedahl Properties, LLC, (collectively Storedahl) appeal from the superior court's order upholding the Clark County Board of County Commissioners' (Board) reversal of the county hearing examiner's (Examiner) decision to grant Storedahl's requested rezone, which would allow mining expansion at its Daybreak site. We hold that because the Board did not disagree with any fact found by the Examiner in determining that the rezone was consistent with the comprehensive plan and policies, the Examiner's facts became verities. Thus, Storedahl was entitled to the requested rezone. We reverse and remand for the superior court to vacate its decision with instructions to reverse the Board's decision and to require the Board to approve the rezone.

## FACTS

¶2 The Woodside family purchased the 350-acre area of land currently known as Daybreak Mine (the Daybreak site) between 1968 and 1972. A portion of the Daybreak site lies adjacent to the east fork of the Lewis River. Mining was already occurring on the Daybreak site when Woodside took ownership in 1968. Other parties, not relevant to this appeal, mined the property until 1989, when Storedahl acquired the mining permit. Storedahl ultimately purchased the property in 1997.

¶3 Before the 1973 zone change, Clark County (County) had designated the land holding the entire Daybreak site as "F-X," a zone that permitted all uses, including mining, and excluded only heavy manufacturing. In 1973, the County amended the F-X zone to limit permitted uses, but provided:

All uses in existence and occurring on a specific parcel of land which legally qualified as "permitted uses" under provisions of the former F-X Rural Use Zone shall continue as conforming uses after the effective date of the ordinance codified herein and for the duration of this interim measure, but in no case shall any use be allowed to expand into adjoining or contiguous property without an approved zone change.

Former CLARK COUNTY CODE (CCC) 18.30.070 (1973); 7 Clerk's Papers (CP) at 1378.

¶4 In 1980, the County again changed the zoning as part of its 1980 Comprehensive Plan.[1] The County changed the zone containing the Daybreak site to agricultural (AG), but it also applied a surface mining overlay zone (S-overlay) to virtually all existing mining operations and to parcels that owners or operators intended to mine. The S-overlay covered 250 acres of the Daybreak site and left approximately 80 acres zoned solely as AG.

¶5 In 1995, the County repealed former CCC 18.411.070, thus eliminating the "shall continue as conforming uses" language. 4 CP at 716; 7 CP at 1378, 1381. Instead, it adopted a comprehensive plan excluding mining from the 100-year floodplain, which included the east fork of the Lewis River. As a result, the County removed the S-overlay from approximately 250 acres of the Daybreak site that was within the 100-year floodplain and added an S-overlay to approximately 40 acres of the Daybreak site that the County had previously designated as AG. As a result, approximately 60 acres, all located outside of the originally mined 71 acres,[2] remained for surface mining.

¶6 An alleged 1997 Clark County notice and order concluded that Storedahl had nonconforming use rights to

---

[1] The County recodified CCC 18.30.070 as CCC 18.411.070 in 1980. Both versions included the same "shall continue as conforming uses" language. 7 CP at 1378-79. The County added the following language to CCC 18.411.070(B): "and further, any expansion on the original parcel shall comply with the standards contained in the district within which the use is permitted." 7 CP at 1379.

[2] The first surface mining permit that Woodside obtained from the Washington State Board of Natural Resources in 1971 allowed for surface mining on only 71 acres of the property.

mine at the Daybreak site. In 1998, Storedahl applied to expand its mining operation on the Daybreak site to include approximately 160 to 170 acres located outside the 100-year floodplain, which the Federal Emergency Management Agency (FEMA) was preparing to modify. In 2000, FEMA did, in fact, finalize its revised flood insurance rate map, which the County then adopted. This revision confirmed that none of Storedahl's requested mining expansion would occur within the 100-year floodplain.

¶7 Storedahl supplemented its application to expand its mining on the Daybreak site in 2003, again asking for permission to mine approximately 170 acres, after Washington adopted the diminishing assets doctrine for nonconforming use in mining.

¶8 In late 2004, Storedahl appeared before the Examiner to address multiple permit applications and its application for a rezone. Specifically, Storedahl requested a rezone that would allow it to expand its mining operation by 178 acres, 100 acres of which it would mine. The Examiner approved the rezone as consistent with the newly approved FEMA floodplain map, approved all permit applications, and adopted various conditions of approval.

¶9 The Board reversed the Examiner's rezone decision, holding:

> The zone change should be denied because the change does not further the public health, safety, morals or welfare as required by CCC 18.503.060(3). The Hearings Examiner erred in concluding that the "public interest" rezone criteria was met because substantial mitigation would not occur if mining proceeded under nonconforming use rights. This conclusion was erroneous for at least two reasons. First, the federally approved Habitat Conservation Plan (which contains the bulk of mitigation measures under review) was sought by the applicant due to its business decision to avoid "take" liability under the federal Endangered Species Act. Nothing in the record suggests that the applicant would alter its commitment to a federal safe sanctuary depending upon whether county approvals are premised upon a conforming zone change or

nonconforming mining rights. Second, the county has independent authority to regulate nonconforming uses, so long as such regulation does not effectively prohibit the use.

13 CP at 2431-32. The Board then stated:

Although the Board has concluded that the requested rezone should be denied because mining at this location is not in the public interest, the applicant claims nonconforming rights to mine and process aggregate on the site. Decisions on the non-zone change applications . . . do not turn on whether such applications are reviewed as conforming or nonconforming uses. However, the extent of nonconforming mining rights has not been adjudicated by the Hearings Examiner, and is contested. Accordingly, this matter should be remanded to the Examiner for the limited purpose of determining whether or not the present proposal, as approved by the Hearing Examiner and modified by this resolution, falls within the scope of nonconforming rights enjoyed by the applicant.

13 CP at 2432-33.

¶10 On remand, the Examiner determined that former CCC 18.30.070 contained a somewhat ambiguous statement because it classified preexisting uses that the County no longer allowed as conforming uses. After assessing the history of the Daybreak site's zoning status, the Examiner determined that it became a nonconforming use in 1973. Further, he determined that, under the doctrine of diminishing assets, Storedahl was entitled to mine the entire 350 acres that Woodside owned at the time the use became nonconforming.

¶11 Fish First and Friends of East Fork (FF/FOEF) appealed the Examiner's decision that Storedahl could mine the entire 350 acres, while Storedahl appealed the Examiner's decision establishing 1973 as the date of nonconformity. The Board determined that the Examiner did not err by determining that 1973 was the date that mining became a nonconforming use on the property. But because the first surface mining permit that Woodside obtained from the Washington State Board of Natural Resources (DNR) in 1971 allowed for surface mining on only 71 acres

of the property, the Board determined that, in 1973, there was not substantial evidence to support mining expansion beyond the original 71 acres listed in the DNR reclamation plan. In addition, the Board found that there was not substantial evidence to find that the doctrine of diminishing assets would apply beyond the original 71 acres because Storedahl failed to prove any intent to expand mining before the 1973 zone change.

¶12 The Board remanded to the Examiner on an issue not relevant to this appeal, and then the Board adopted the Examiner's decision, thus creating a final order on the issues.

¶13 Storedahl and FF/FOEF both appealed under the Land Use Petition Act (LUPA), RCW 36.70C.020, in Clark County Superior Court. The trial court upheld the Board's denial of a rezone, upheld the Board's decisions about nonconforming use, upheld the Board's decision to allow Commissioner Stuart to participate in Storedahl's hearing, and denied Storedahl's claims for damages against the County. The trial court also denied Storedahl's request to conduct pretrial discovery, and its subsequent public records act[3] request.

REZONE REQUEST

¶14 LUPA, chapter 36.70C RCW, governs review of land use decisions. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). We base our review on the record created before the Examiner. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 483-84, 61 P.3d 1141 (2003); RCW 36.70C.130(1), (2).

¶15 On appeal, Storedahl bears the burden of establishing one of the errors set forth in RCW 36.70C-.130(1). *Tahoma Audubon Soc'y v. Park Junction Partners*, 128 Wn. App. 671, 680, 116 P.3d 1046 (2005). Storedahl must establish that:

---

[3] Ch. 42.56 RCW.

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).

¶16 Standards (a), (b), (e), and (f) present questions of law that this court reviews de novo. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006) (citing *HJS Dev.*, 148 Wn.2d at 468). Standard (c) concerns a factual determination that this court reviews for substantial evidence. *Cingular Wireless*, 131 Wn. App. at 768. And finally, the clearly erroneous test under (d) involves applying the law to the facts. *Cingular Wireless*, 131 Wn. App. at 768 (citing *Citizens to Pres. Pioneer Park, LLC v. City of Mercer Island*, 106 Wn. App. 461, 473, 24 P.3d 1079 (2001)). We grant some deference to the party who prevailed in the highest forum that exercised fact-finding authority. *City of University Place v. McGuire*, 144 Wn.2d 640, 652-53, 30 P.3d 453 (2001).

¶17 Storedahl contends, under RCW 36.70C.130(1)(a), that the Board's reversal of the Examiner's findings was erroneous because the Board failed to follow its own procedure, which required it to explain why Storedahl did not satisfy the rezone criteria. Specifically, Storedahl claims that the Board's resolution violated the CCC provision for type III appeal procedures, which apply to parcel-specific rezones. The CCC provides:

If the board reverses or modifies an appealed decision, then the board shall adopt a final order that contains:

(a) A statement of the applicable criteria and standards in this code and other applicable law relevant to the appeal;

(b) A statement of the facts that the board finds show the appealed decision does not comply with applicable approval criteria or development standards;

(c) The reasons for a conclusion to modify or reverse the decision; and

(d) The decision to modify or reverse the decision and, if approved, any conditions of approval necessary to ensure the proposed development will comply with applicable criteria and standards.

CCC 40.510.030(I)(3)(b)(3).[4] In order to obtain the rezone, Storedahl needed to satisfy the following four criteria under former CCC 18.503.060(3):[5]

  a.  Rezone Criterion 1 - CCC 18.503.060(1): *The zone change is consistent with the comprehensive plan map designation.*

  b.  Rezone Criterion 2 - CCC 18.503.060(2): *The requested zone change is consistent with the plan policies and locational criteria and the purpose statement of the zoning district.*

1 CP at 58.

  c.  Rezone [C]riterion 3 - CCC 18.503.060(3): *Except for industrial designation, conditions have substantially changed since the zone was applied to the property and that the rezone furthers public health, safety, morals or welfare.*

1 CP at 64.

  d.  Rezone Criterion 4 - (CCC 18.503.060(4): *There are adequate public facilities and services to serve the requested zone change.*

1 CP at 67.

---

[4] The County recodified CCC 40.510.030(H)(3)(b)(3) as CCC 40.510.030(I)(3)(b)(3).

[5] CCC rezone criteria has changed substantially and is now found at CCC 40.560.020(H).

¶18 In his 81-page order, the Examiner found that Storedahl satisfied each of the statutory criteria for the rezone. The Examiner also found that 15 additional specific comprehensive plan policies were met—e.g., mitigation of potential adverse effects on water quality, fish and wildlife, adjacent activities, and scenic qualities of the shorelines. The Examiner concluded that the environmental consequences were adequately identified, evaluated, and mitigated. Storedahl had complied with requirements of National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347, and other agencies. These findings did not depend upon the existence of a nonconforming use but were on the merits of the rezone application.

¶19 But the Board reversed the Examiner's decision because it determined that Storedahl failed to satisfy CCC 18.503.060(3)—that the rezone furthered public health, safety, morals, or welfare.

¶20 The Examiner provided a detailed analysis for each of the four rezone criteria found in CCC 18.503.060. Regarding the public welfare prong, the Examiner found that the Daybreak site complied with the County's comprehensive plan because it would produce high-quality gravel, it would protect groundwater wells, it would address concerns about noise and aesthetics, and it would protect the environment. The Board did not reverse these findings and the County does not challenge them now on appeal. As such, they are verities. *State v. Stenson*, 132 Wn.2d 668, 697, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998).

¶21 In order to reverse the Examiner, the Board had to provide a statement of the applicable code criteria and other applicable law relevant to the appeal, the facts the Board found showing the appealed decision did not comply with applicable approval criteria, the reasons for reversing the decision, and the decision to modify or reverse the decision. CCC 40.510.030(I)(3)(b)(3).

¶22 But in its 2005 resolution, the Board explained its reversal as follows:

The zone change should be denied because the change does not further the public health, safety, morals or welfare as required by CCC 18.503.060(3). The Hearings Examiner erred in concluding that the "public interest" rezone criteria was met because substantial mitigation would not occur if mining proceeded under nonconforming use rights. This conclusion was erroneous for at least two reasons. First, the federally approved Habitat Conservation Plan (which contains the bulk of mitigation measures under review) was sought by the applicant due to its business decision to avoid "take" liability under the federal Endangered Species Act[ of 1973, 16 U.S.C. §§ 1531-1544]. Nothing in the record suggests that the applicant would alter its commitment to a federal safe sanctuary depending upon whether county approvals are premised upon a conforming zone change or nonconforming mining rights. Second, the county has independent authority to regulate nonconforming uses, so long as such regulation does not effectively prohibit the use.

1 CP at 121-22.

¶23 The Board failed to provide a statement listing the facts it found showing the appealed decision did not comply with applicable approval criteria. CCC 40.510.030(I)(3)(b)(3). Instead, it relied on the Examiner's allegedly false premise regarding potential mitigation, along with the County's ability to regulate the Daybreak site as a nonconforming use. It did this even though Storedahl applied for a rezone and had not presented a proposal to mine the Daybreak site as a nonconforming use.

¶24 As a quasi-judicial decision, the Board must evaluate site-specific rezone requests under legislatively established criteria, including the comprehensive plan policies and other development regulations, and those criteria constrain the County's discretion. RCW 36.70B.030(2) provides:

During project review, a local government or any subsequent reviewing body shall determine whether the items listed in this subsection are defined in the development regulations applicable to the proposed project or, in the absence of applicable regulations the adopted comprehensive plan. *At a minimum,*

*such applicable regulations or plans shall be determinative of the:*

*(a) Type of land use permitted at the site,* including uses that may be allowed under certain circumstances, such as planned unit developments and conditional and special uses, if the criteria for their approval have been satisfied.

(Emphasis added.) The Board's reliance on nonconforming use rights ignored RCW 36.70B.030(2)'s requirement that the Board look to the comprehensive plan as determinative of the type of land use permitted at the Daybreak site.

¶25 In contrast, the Examiner did not base his rezone decision on nonconforming rights; instead, he applied the CCC 18.503.060 rezone criteria and found that Storedahl's proposed actions satisfied the comprehensive plan. While the Examiner addressed Storedahl's nonconforming use rights in an earlier section of his decision, his findings regarding the rezone request did not refer to nonconforming rights.

¶26 *Maranatha Mining, Inc. v. Pierce County*, 59 Wn. App. 795, 801 P.2d 985 (1990), is instructive in our consideration. It concerned an application in a general use zone to conduct gravel mining and asphalt manufacturing. *Maranatha*, 59 Wn. App. at 797. The hearing examiner made findings and decided to grant the permit. *Maranatha*, 59 Wn. App. at 798. The Pierce County Council disagreed with the examiner's conclusion, made no findings, and did not disagree with the examiner's findings. *Maranatha*, 59 Wn. App. at 799. In wording similar to that of the Clark County Code, if the Pierce County Council disagreed with the examiner findings, it had to delineate the differences. *Maranatha*, 59 Wn. App. at 802 (citing PIERCE COUNTY CODE 18.10.680(E)(2)(e)). Because the Pierce County Council did not follow its own procedures and did not disagree with any findings, we held that its decision to deny the permit was an arbitrary and capricious application of its police power. *Maranatha*, 59 Wn. App. at 804. Our holding here is similar to that in *Maranatha*.

¶27 In the instant case, the Examiner's findings are binding, just as they were in *Maranatha*, because the Board did not disagree with them. *Stenson*, 132 Wn.2d at 697. Whether Storedahl had any nonconforming rights was irrelevant to the consideration of the rezone issue. It also was not relevant whether Storedahl would have been required to or would develop a habitat conservation plan under the Endangered Species Act if it was operating under a nonconforming use.

¶28 We hold that Storedahl established that the Board failed to follow a prescribed process under RCW 36.70C-.130(1)(a). Specifically, the Board failed to list the facts it found showing the appealed decision did not comply with applicable approval criteria under CCC 40.510.030-(I)(3)(b)(3). Additionally, the Board failed to follow RCW 36.70B.030(2)'s requirement that the comprehensive plan is determinative of the type of land use permitted at the Daybreak site. Further, the Board did not reverse nor challenge any of the Examiner's findings, which remain as verities. *Stenson*, 132 Wn.2d at 697. Accordingly, we reverse and remand with instructions to grant the rezone and reinstate the Examiner's decision.[6]

¶29 Reversed and remanded to vacate the superior court's determinations, with instructions to reverse the decision of the Board, and for the Board to grant Storedahl's rezone application.

VAN DEREN, A.C.J., concurs.

¶30 PENOYAR, J. — I respectfully dissent. While the hearing examiner (Examiner) made numerous findings and, as the majority points out, the Clark County Board of County Commissioners (Board) made few findings to the

---

[6] Because of our decision, we do not address any issue of nonconforming use or the date on which it was effective. As well, we do not address any issue regarding the appearance of fairness doctrine. Finally, we do not answer any issue concerning the request under the public records act, chapter 42.56 RCW. The County is not entitled to attorney fees under RCW 4.84.370 or RAP 18.1 because it is not a prevailing party.

contrary, the Board did disagree with one specific and fundamental assumption underlying the Examiner's decision, which was that Storedahl had a nonconforming right to mine almost the entire parcel even if he did not grant the rezone. My view is that this court first needs to resolve this dispute because it formed the underlying basis for many of the Examiner's findings.

¶31 Based on this potentially faulty assumption, the Examiner clearly believed that he could best protect the environment by granting the rezone with various conditions included to protect environmental values:

> As a starting point, most of the opponents argue strongly that the County should deny this proposal and prohibit further mining in the [East Fork Lewis River] due to the damaging effects of mining, and this operation in particular, on protected wild fish. . . . The Examiner agrees with these parties about the effect of mining on fish and fish habitat, but the cessation of mining at this site is <u>not</u> one of the legal options. . . . Therefore, the analysis is a comparison of the nature and level of mining under the nonconforming use right and the nature and level of mining under the applicant's proposal. In other words, what is more protective of the public health and welfare as well as that of the fish: continuation of mining under the nonconforming use right, or expansion and relocation of mining under the current proposal.

Clerk's Papers (CP) at 50.

> [M]any of the criteria, including the environmental analysis for the [habitat conservation plan], assume a particular base level of operation. If that base level is a zero operation, then the extraction and processing contemplated in this proposal would be a significant increase over the base level. On the other hand, if the base level is assumed to be the applicant's claimed nonconforming use, then the impact of the extraction and process contemplated here would likely be a net <u>reduction</u> in environmental impact.

CP at 42.

¶32 The Board challenged the Examiner's underlying assumption:

The zone change should be denied because the change does not further the public health, safety, morals or welfare as required by CCC 18.503.060(3). The Hearings Examiner erred in concluding that the "public interest" rezone criteria was met because substantial mitigation would not occur if mining proceeded under nonconforming use rights. This conclusion was erroneous for at least two reasons. First, the federally approved Habitat Conservation Plan (which contains the bulk of mitigation measures under review) was sought by the applicant due to its business decision to avoid "take" liability under the federal Endangered Species Act[ of 1973, 16 U.S.C. §§ 1531-1544]. Nothing in the record suggests that the applicant would alter its commitment to a federal safe sanctuary depending upon whether county approvals are premised upon a conforming zone change or nonconforming mining rights. Second, the county has independent authority to regulate nonconforming uses, so long as such regulation does not effectively prohibit the use.

CP at 121-22.

¶33 Clearly, the Board disagreed with the Examiner's determination of what the applicable base level would be if the Examiner denied the rezone application. In sum, the Board looked at the same facts as the Examiner but applied a different underlying assumption, thus reaching a different conclusion. Even the Examiner acknowledged:

In light of [Storedahl's] lawful nonconforming use . . . the question is not whether a new mining operation should be allowed to begin on a virgin site. It is clear that a new mining operation on a virgin site adjacent to the [East Fork Lewis River] could not meet the approval criteria, and would be denied.

CP at 44. This court should have addressed this potentially faulty presumption before engaging in its analysis of the CCC 18.503.060 rezone criteria.

¶34 I also disagree with the majority's holding that the examiner reached an overall conclusion of whether the rezone "furthers public health, safety, morals or welfare" as required by CCC 18.503.060(3). While the Examiner made

936

numerous findings on environmental and other impacts and benefits of the project, he never concluded that the rezone, as a whole, would satisfy these criteria.

¶35 In sum, I believe that the proper course for this court is to make a finding on the underlying nonconforming use issue. Only then should this court consider the relief to be granted in this case, including a remand for further findings. As we have not followed that process, I must dissent.

Review denied at 164 Wn.2d 1031 (2008).