229 P.3d 800 (2009)
154 Wash.App. 492
PHOENIX DEVELOPMENT, INC., a Washington corporation, and G&S Sundquist Third Family Limited Partnership, a Washington limited partnership, Motions, Appellants,
v.
CITY OF WOODINVILLE, a Washington municipal corporation, and Concerned Neighbors of Wellington, a Washington nonprofit corporation, Respondents.
No. 62167-0-I.
Court of Appeals of Washington, Division 1.
November 2, 2009.
Publication Ordered February 22, 1010.
*802 George Richard Hill, McCullough Hill PS, Seattle, WA, John Maurice Groen, Groen Stephens & Klinge LLP, Bellevue, WA, for Appellants.
Greg Alan Rubstello, Michael Charles Walter, Keating Bucklin McCormack Inc. PS, Seattle, WA, Philip Albert Talmadge, Talmadge/Fitzpatrick, Tukwila, WA, for Respondent City of Woodinville.
J. Richard Aramburu, Jeffrey M. Eustis, Aramburu & Eustis LLP, Seattle, WA, for Respondent Concerned Neighbors of Wellington.
Timothy M. Harris, Building Industry Assoc. of Washington State, Olympia, WA, for Amicus Curiae Building Industry Association of Washington.
LEACH, J.
¶ 1 Phoenix Development, Inc., appeals decisions of the City of Woodinville denying site-specific rezone requests and subdivision *803 applications for two properties. Because Phoenix's proposed rezones implement the Woodinville comprehensive plan and current zoning code and comply with the city code's general rezone criteria, we hold that the rezone denials were improper. We therefore reverse the city council's decision and remand for a determination on Phoenix's preliminary plat applications.

Background
¶ 2 This matter relates to two parcels located in the Wellington neighborhood of northwest Woodinville, a 38.7 acre parcel known as the Wood Trails proposal and a 16.48 acre parcel known as the Montevallo proposal.[1] In June 2004, Phoenix asked the city to amend the zoning map for these two parcels to rezone each from R-1, which allows one dwelling unit per acre, to R-4, which allows up to four dwelling units per acre[2] and submitted applications for subdivision approval. The preliminary plat applications proposed subdividing each parcel into 66 single-family residential lots[3] and included the transfer of 19 density credits from Wood Trails to Montevallo to achieve the desired number of lots on the smaller Montevallo parcel. Because only nine density credits could be transferred, the number of lots in the Montevallo proposal was reduced to 56.[4]
¶ 3 City staff prepared a draft environmental impact statement (DEIS) analyzing the alternatives and impacts of the Wood Trails and Montevallo proposals. The city published the DEIS in January 2006. The key issues addressed in the DEIS were soil stability, seismic hazards, and erosion potential; surface water, ground water/seepage and water runoff; wildlife, threatened or endangered species, habitat and migration routes; land use, plans and policies, neighborhood character, open space and environmentally sensitive areas; transportation, existing and proposed street system, motorized traffic, non-motorized traffic/pedestrian movement/school safe walk routes and safety hazards; and parks and recreation. The DEIS evaluated the proposed developments (proposed action) and three alternatives: (1) development at the current R-1 zoning with individual septic systems like the existing land uses in the Wellington neighborhood (R-1 zoning alternative), (2) development of attached housing (townhomes) on the Wood Trails property, with single-family lots on the Montevallo property (attached housing alternative), and (3) no development on either site (no action alternative).
¶ 4 The final environmental impact statement (FEIS) published in December 2006 provided additional analysis and clarification of several elements, descriptions of minor changes to Phoenix's proposal, and responses to public comments. The FEIS identified the following key environmental issues:
Earth: Soil stability/possible sand layer, seismic hazards and erosion potential associated with development of Wood Trails.
Water Resources: Surface water, ground water/seepage and water runoff associated with development of Wood Trails and Montevallo.
Plants & Animals: Wildlife, threatened or endangered species, habitat and wildlife connectivity routes associated with development of Wood Trails and Montevallo.
Land Use: Land use plans and policies, neighborhood character, open space and critical areas associated with development of Wood Trails and Montevallo.
Transportation: Transportation, existing and proposed street system, motorized traffic, non-motorized traffic/pedestrian movement/school safe walking routes and safety hazards associated with development of Wood Trails and Montevallo.
Public Services: Parks and recreation associated with development of Wood Trails and Montevallo. Fire, police, schools, water and sewer were determined not to be significant environmental issues.
*804 The FEIS includes tables comparing the impacts, mitigation, and significant unavoidable adverse impacts of the proposed action and each alternative action on the Wood Trails and Montevallo sites.[5] These tables show that the majority of the significant unavoidable adverse impacts for the proposed action are also likely to occur under the R-1 zoning alternative. The FEIS concludes that "[a]ll likely impacts could be mitigated by a redesign  by adopted City regulations and/or by elements incorporated into the design of the proposal  to a level that is considered less than significant."[6]
¶ 5 Staff reports for Montevallo and Wood Trails also analyzed whether the proposals complied with the comprehensive plan and the Woodinville Municipal Code (WMC). The city code criteria for a rezone provide:
A zone reclassification shall be granted only if the applicant demonstrates that the proposal is consistent with the Comprehensive Plan and applicable functional plans at the time the application for such zone reclassification is submitted, and complies with the following criteria:
(1) There is a demonstrated need for additional zoning as the type proposed.
(2) The zone reclassification is consistent and compatible with uses and zoning of the surrounding properties.
(3) The property is practically and physically suited for the uses allowed in the proposed zone reclassification.[[7]]
¶ 6 Staff concluded that both proposals met the R-4 residential zone criteria and met two of three rezone criteria, under subsections 2 and 3. The staff report did not make a recommendation as to the first criterion, the "demonstrated need" requirement of WMC 21.44.070(1), stating that this criterion "ultimately requires an objective judgment by the Hearing Examiner and City Council based upon relevant City plans, policies, goals, and timeframes."[8] Staff recommended approval of the requested rezones as long as the "demonstrated need" requirement was met. Staff recommended that the rezone approvals be subject to a number of conditions, including mitigation measures to protect the environment, fire department access requirements, park and transportation impact fees, tree retention, and surface water management.
¶ 7 Public hearings regarding the Montevallo and Wood Trails rezone requests and preliminary plat applications were held on March 14 and 15 and April 5, 2007. The hearing examiner considered testimony and documentary evidence, including the FEIS and a lengthy analysis of the proposals submitted by the Concerned Neighbors of Wellington (CNW).[9] The hearing examiner recommended that the city council approve the rezones from R-1 to R-4. The hearing examiner also recommended approval of the subdivision of Wood Trails into 66 lots with the transfer of nine lots to Montevallo and the subdivision of Montevallo into 56 lots, subject to numerous conditions.[10] In the decision for each property, the hearing examiner clearly set forth the R-4 rezone criteria, applied those criteria to his findings, and concluded that all criteria were met.
¶ 8 On August 20, 2007, the city council entered findings, conclusions, and decision denying Phoenix's requests to rezone Wood Trails and Montevallo from R-1 to R-4. Based on its decision regarding the rezones, the council summarily denied the subdivisions as inconsistent with the sites' existing R-1 zoning designation.[11] The council, in its "legislative capacity," found that the existing R-1 zoning designation was appropriate for Phoenix's property.[12] In its "quasi-judicial capacity," the city council concluded that the rezones would be "inconsistent with significant *805 Comprehensive Plan Policies," that the "demonstrated need" criterion in WMC 21.44.070 had not been met, and that the rezones did not "bear a substantial relationship to the public health, safety, morals or welfare" as required by case law.[13] The council concluded that public services in areas serving the Wood Trails and Montevallo proposals were not adequate[14] and that the city could not provide adequate services to those parcels in the near-term because the resources were already committed under the city's capital improvement plan for infrastructure in other parts of the city, such as the downtown area, which the city council had previously selected for focused growth.[15] The council found that additional public services were needed to support the proposed developments, that reallocating capital resources to the subject area would be premature and inefficient, and that the mitigation measures that the developments would contribute, such as impact fees, would not correct the public service deficiencies.[16]
¶ 9 Phoenix filed a land use petition in superior court, seeking reversal of the city council's denial of its rezone and subdivision requests. The superior court dismissed the petition, holding that Phoenix failed to establish any of the six standards set out in the Land Use Petition Act, RCW 36.70C.130.

Standard of Review
¶ 10 The denial of a site-specific rezone is a land use decision.[17] The Land Use Petition Act (LUPA), chapter 36.70C RCW, provides the exclusive means for judicial review of a land use decision, with the exception of those decisions subject to review by bodies such as the growth management hearings boards.[18] Courts review denial of a site-specific rezone under LUPA[19] and may grant relief only if a petitioner has met its burden of establishing one of the following standards:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.[[20]]
In reviewing a land use decision, this court stands in the same position as the superior court.[21] Standards (a), (b), (e), and (f) present questions of law that we review de novo.[22] When reviewing a challenge to the sufficiency of the evidence under subsection (c), we view facts and inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority, in this case the city and CNW.[23] The *806 clearly erroneous test under (d) involves applying the law to the facts.[24]

Analysis

A. Legislative Findings
¶ 11 As a preliminary matter, Phoenix argues that the council's finding of fact 6 is unlawful because the council purports to be acting "in its legislative capacity" when the council was required to be acting in a quasi-judicial capacity. We agree.
¶ 12 A site-specific rezone request is a quasi-judicial decision that the council must evaluate under legislatively established criteria, including the comprehensive plan policies[25] and other development regulations, which constrain the council's discretion.[26] A quasi-judicial action involves the application of existing law to particular facts rather than the creation of new policy.[27] Thus, when acting in its quasi-judicial capacity, the council is limited to interpreting existing policies and applying those policies to the particular facts relevant to its decision. By invoking its legislative authority midway through the quasi-judicial proceeding, the council adopted a new policy rather than applying existing policies and regulations. We therefore hold that finding of fact 6 in both the Montevallo and Wood Trails decisions is the product of an unlawful exercise of the council's legislative authority.

B. Rezone Denials
¶ 13 An applicant may challenge the denial of a rezone request on the basis that a local jurisdiction did not follow its own development regulations.[28] Local development regulations, including zoning regulations, directly constrain land use decisions.[29] Here, Phoenix alleges that the city council failed to follow the city's zoning code when it denied the rezone requests.
¶ 14 Three general rules apply to rezone applications: (1) there is no presumption of validity favoring a rezone; (2) the rezone proponent must demonstrate that circumstances have changed since the original zoning; and (3) the rezone must have a substantial relationship to the public health, safety, morals, or general welfare.[30] When a proposed rezone implements the policies of a comprehensive plan, the proponent is not required to demonstrate changed circumstances.[31]
¶ 15 Woodinville imposes additional criteria for approval of a site-specific rezone application in WMC 21.44.070:
A zone reclassification shall be granted only if the applicant demonstrates that the proposal is consistent with the Comprehensive Plan and applicable functional plans at the time the application for such zone reclassification is submitted, and complies with the following criteria:
(1) There is a demonstrated need for additional zoning as the type proposed.
(2) The zone reclassification is consistent and compatible with uses and zoning of the surrounding properties.
(3) The property is practically and physically suited for the uses allowed in the proposed zone reclassification.
¶ 16 The Woodinville zoning code contains purpose statements for various zones and map designations. The code requires that these purpose statements are to be used to guide application of the zones and land use *807 regulations within the zones.[32] WMC 21.04.080 describes the purpose of the city's urban residential zones:
(1) The purpose of the Urban Residential zones (R) is to implement Comprehensive Plan goals and policies for housing quality, diversity and affordability, and to efficiently use residential land, public services and energy. These purposes are accomplished by:
(a) Providing, in the low density zones (R-1 through R-4), for predominantly single-family detached dwelling units. Other development types, such as duplexes and accessory units, are allowed under special circumstances. Developments with densities less than R-4 are allowed only if adequate services cannot be provided.
. . . .
(2) Use of this zone is appropriate in residential areas designated by the Comprehensive Plan as follows:
(a) The R-1 zone on or adjacent to lands with area-wide environmental constraints, or in well-established subdivisions of the same density, which are served at the time of development by public or private facilities and services adequate to support planned densities;
(b) The R-4 through R-8 zones on urban lands that are predominantly environmentally unconstrained and are served at the time of development by adequate public sewers, water supply, roads, and other needed public facilities and services. . . .
¶ 17 The council concluded that the R-4 zone was not appropriate for Phoenix's properties for a number of reasons. The council concluded that these rezones were inappropriate "due to the deficient public facilities and services (other than sewer) in the area where the property is located and the currently ongoing sustainable development study."[33] The council further concluded that there was no demonstrated need for the proposed rezones, that the rezones were inconsistent with significant comprehensive plan policies, and that the rezones did not bear a substantial relationship to public health, safety, morals, or welfare.

1. Adequate Services under WMC 21.04.080
¶ 18 Phoenix claims that WMC 21.04.080 requires that the city approve the rezone applications unless adequate services cannot be provided. WMC 21.04.080 requires Woodinville to approve a request to rezone property to R-4 if the request meets all the other rezone criteria.
¶ 19 WMC 21.04.080(a) provides, "Developments with densities less than R-4 are allowed only if adequate services cannot be provided. . . ." The city characterizes this code purpose statement as "simply an indicia of legislative intent" that does not give rise to an enforceable right or create a mandatory code requirement. The city claims that this provision does not supplement the specific rezone criteria described in WMC 21.44.070 and that there is no indication that the council should use the zoning code purpose statements when making site-specific zoning decisions. The city notes that WMC 21.44.070 does not refer to any purpose statement.
¶ 20 But the city fails to reconcile its position with the mandate of WMC 21.04.020: "The purpose statements for each zone and map designation set forth in the following sections shall be used to guide the application of the zones and designations to all lands in the City of Woodinville." The city also does not explain why WMC 21.04.080 is phrased in mandatory terms if it is an expression of intent only. Finally, the city ignores the historical context against which it adopted WMC 21.04.080.
¶ 21 To satisfy certain requirements of the Growth Management Act (GMA), chapter 36.70A RCW, the city adopted its GMA comprehensive plan on June 24, 1996.[34] In Hensley v. City of Woodinville,[35] several policies contained in the comprehensive plan were challenged before a growth management *808 hearings board, including policy LU-3.6: "Allow densities higher than one dwelling unit per acre only when adequate services and facilities are available to serve the proposed development." The board interpreted LU-3.6 to prohibit development in excess of one dwelling unit per acre unless sewer service is available and held that it was inconsistent with a GMA policy.[36]
¶ 22 The board stated, "Woodinville may not engender or perpetuate a near-term land use pattern (one-acre lots) that will effectively thwart long-term (beyond the twenty-year planning horizon) urban development within its boundaries."[37] The board remanded policy LU-3.6 to the city with instructions to either delete it or amend it consistent with the holdings and conclusions in the board's opinion.[38] The city did not appeal the board's decision and deleted policy LU-3.6 from its comprehensive plan.[39]
¶ 23 On July 14, 1997, the city adopted its amended zoning code, including the statement of purpose for urban zones quoted above. The city's adoption of WMC 21.04.080 shortly after the hearing board's admonition that the city may not engender or perpetuate one-acre lots to thwart long-term urban development within its boundaries demonstrates the city's decision to comply with a GMA density policy by allowing developments with densities less than R-4 only if adequate services cannot be provided.
¶ 24 Under WMC 21.04.080(1)(a) the city must approve Phoenix's request to rezone properties from R-1 to R-4, if adequate services can be provided, the requirements of WMC 21.44.070 are met, the provisions of WMC 21.04.080(2)(a) do not apply, and the rezones are not otherwise prohibited by law.
¶ 25 In several findings and conclusions, the council stressed that its fiscal constraints required it to prioritize its actions and had therefore selected the downtown area for focused growth and infrastructure. For example, the council found that
[t]he City is not yet prepared to commit capital resources to the subject area in the near-term. Committing the City to prematurely construct infrastructure and provide services to this area will become increasingly problematic, resulting in an increasing inefficiency of services thereby lessening the economic gain and placing a growing strain on the fiscal resources of the community.[[40]]
The council concluded that the proposals were inconsistent with the city's strategy to meet its regional growth objective.
The City has chosen to meet the growth objective in the CBD [Central Business District] while insuring that new growth in other areas of the City does not negatively impact the City's transportation[,] land use and capital facilities goals and objectives.[[41]]
But the council made no factual findings that would support the denial of the rezones on the basis that adequate services cannot be provided, and a conclusion that adequate services cannot be provided is not supported by evidence that is substantial when viewed in light of the whole record before it.
¶ 26 The council does not identify any services that cannot be provided to Montevallo or Wood Trails. The council vaguely refers to "infrastructure," "facilities," and "services" throughout its decision. The only service specifically mentioned in the council's decision is transportation.
¶ 27 Phoenix argues that transportation is not a "service" under WMC 21.04.080(1)(a). We need not reach the question whether transportation is a service, however, because there is no evidence that transportation cannot be provided to the proposed developments. Rather, the council found that there were "unavoidable adverse impacts to transportation systems" identified by the FEIS which "can be avoided by denial of the rezone."[42] *809 Because WMC 21.04.080(1)(a) requires a zoning density of R-4 or greater unless "adequate services cannot be provided," a finding of "unavoidable adverse impacts" is insufficient to justify the council's decision. Furthermore, the finding is not supported by the record. The FEIS states that "none of the alternatives would generate sufficient additional traffic or changes in traffic patterns to cause significant impacts to the existing level of service. . . ."[43] The FEIS also states that the R-1 development alternative  the development the city now suggests Phoenix can build  would actually generate more daily traffic on some streets than the proposed action, due to the differences in access plans between the alternatives.[44]
¶ 28 In recommending that the rezones be approved, the hearing examiner recognized that under WMC 21.04.080, "[d]evelopments with densities less than R-4 are allowed only if adequate services cannot be provided."[45] The hearing examiner concluded that "the Woodinville code in place when this application vested, stated that this property could not be developed as R-1 because utilities are available."[46] Although it now argues otherwise, the council also recognized in its findings that it was required to determine whether adequate services could be provided.[47] Viewing the record as a whole, substantial evidence does not support the conclusion that adequate services cannot be provided to Wood Trails and Montevallo.

2. Demonstrated Need
¶ 29 Phoenix argues that the council erred when it concluded that the demonstrated need requirement under WMC 21.44.070 was not met. Phoenix urges the court to adopt the hearing examiner's view, arguing that the examiner "presented a thorough analysis and resolution of this issue."
¶ 30 The hearing examiner concluded that there is a demonstrated need for additional zoning of the type proposed by Phoenix. The hearing examiner's recommendation considered all evidence presented. Although the staff report did not contain a recommendation as to demonstrated need, the hearing examiner considered the opinion expressed in the staff report that the city can meet its required housing allocation under the GMA for the planning period of 2001 to 2022 without further zone changes to higher density. The hearing examiner also considered evidence presented by CNW that a large number of homes similar to those proposed by Phoenix are available for sale within 10 miles of the proposed developments, although those homes are not necessarily in Woodinville.[48] Finally, the hearing examiner considered evidence presented by Phoenix that the city used a flawed analysis in reaching the conclusion that additional R-4 zoning was not needed. He also considered evidence that land zoned R-1 constitutes approximately 30 percent of the total area of the city and approximately 50 percent of the residentially zoned land, while available land zoned R-4 constitutes less than 2.7 percent of the city.[49] The hearing examiner concluded,
Clearly more R-4 Zoning is needed to create a diversity of building sites availability [sic] by establishing more areas where detached single-family can be constructed at lower densities [sic] than R-1 densities. In addition, the Growth Management Hearings Board has held that Woodinville is not to perpetuate one-acre lots that will effectively thwart urban development.[[50]]
The hearing examiner's conclusion that the city's relative lack of R-4 zoning compared with its abundance of R-1 zoning demonstrates a need for additional single-family zoning at densities that help to further the *810 goals of Woodinville's comprehensive plan and the GMA is supported by the record. As the board held in Hensley I, one-acre lots thwart, rather than encourage, urban development. The board's decision also reflected Woodinville's obligation to look beyond the 20-year horizon when evaluating both housing needs and the impact of a current decision. CNW's evidence that many similar lots are for sale within 10 miles of the proposed developments indicates that other cities are providing this type of housing, but does little to help us determine whether there is a need for higher density single-family housing in Woodinville. We hold that the city's finding that the proposed rezones are not needed is not supported by evidence that is substantial when viewed in light of the whole record before the court.

3. Consistency with Comprehensive Plan
¶ 31 Land use decisions must generally conform to the jurisdiction's comprehensive plan.[51] In addition, WMC 21.04.070 requires that a rezone be consistent with the city's comprehensive plan and applicable functional plans.
¶ 32 The staff report identifies several policies implicated by the proposed rezones within the land use, housing, community design, capital and public facilities, and environmental elements of the plan. The staff report discusses these policies in detail and concludes that "the development as proposed would be consistent generally with the Comprehensive Plan. The site could accommodate development consistent with the R-4 zone."[52] The hearing examiner found that the proposals were "reasonably compliant with the Woodinville Comprehensive Plan," and adopted and incorporated the relevant portions of the staff report into his decision. The hearing examiner specifically found that
the zone change will allow the development of low-density detached single-family homes in an area designated in the comprehensive plan as low density residential. While arguments have been made that the adjacent neighborhood is much less dense, R-4 is still classified as low density. In addition, buffering as recommended by the City, can alleviate impacts from a slight difference in density. The site will be served with City water and sewer and the street network will be improved. The west side of the site will be left in a Native Growth Protection Area. . . . It presents a range of densities, which encourages a variety of housing types to serve a variety of income levels. It preserves much of the natural features of the site, such as the wetland and will preserve trees in accordance with the City's Tree Retention regulations.[[53]]
The council, on the other hand, concluded that the rezones were not consistent with the comprehensive plan. However, the council did not identify any plan goals or policies that were inconsistent with the proposals. The council's findings do not support its conclusion that the proposals are inconsistent with the comprehensive plan.
¶ 33 Phoenix also argues that the city is collaterally estopped from arguing that R-1 zoning is allowed under the comprehensive plan because the board held in Hensley I that the city could not perpetuate low-density one-acre zoning. Collateral estoppel bars relitigation of identical issues where there has been a final judgment on the merits, the party against whom the plea is asserted was a party to or in privity with a party to the prior adjudication, and application of the doctrine does not work an injustice on the party against whom the doctrine is to be applied.[54] The issue in Hensley I was whether Woodinville's comprehensive plan violated the GMA. That is not identical to the issue here, which is judicial review of the city's denial of two site-specific rezones. Thus, collateral estoppel does not apply.
¶ 34 However, Hensley I is instructive in interpreting the comprehensive plan. As we discussed above, the board held that "Woodinville *811 may not engender or perpetuate a near-term land use pattern (one-acre lots) that will effectively thwart long-term (beyond the twenty-year planning horizon) urban development within its boundaries."[55] In Hensley I, the board held that former LU-3.6, which provided that Woodinville would "[a]llow densities higher than one dwelling unit per acre only when adequate services and facilities are available to serve the proposed development," was inconsistent with goal U-3 of the comprehensive plan, which required connection to the wastewater system when development or subdivision of land occurs at a density greater than one unit per acre, and the GMA goal that cities make urban services available within urban growth areas.[56] To resolve the inconsistency and bring the comprehensive plan into compliance with the GMA, Woodinville deleted LU-3.6 from the comprehensive plan.[57] The council found that "[t]he R-1 zoning is consistent with the `Low Density Residential' land use designation described in the City's Comprehensive Plan. . . ."[58] However, as the hearing examiner pointed out, R-4 is also considered low density zoning under WMC 21.04.080(1)(a).
¶ 35 The FEIS analyzes the impact of the proposed action and the alternatives under approximately 25 policies enumerated in the city's comprehensive plan, including land use, housing, community design, capital and public facilities, and environmental policies.[59] The FEIS identifies no inconsistencies between the proposed rezones and the land use policies in the comprehensive plan. The proposed action was described as more consistent than the R-1 zoning alternative in regard to both housing policies discussed in the FEIS. No inconsistencies were found with the community design policies or the capital and public facilities policy. All of the alternatives had similar impacts on the environmental policies, but no major inconsistencies were identified. For example, all alternatives would cause permanent loss of the wetland on the Wood Trails site. The proposed action and attached housing alternative would cause some wetland impacts on the Montevallo site that would be avoided by the R-1 zoning alternative but would be more protective of water quality in downstream areas than the R-1 zoning alternative. Similarly, the proposed action and attached housing alternative "might be a net improvement in quality in waters downstream from the subject sites" while the R-1 zoning alternative was described as "less protective of stream functions and values."[60] The staff report also contains a discussion of these specific comprehensive plan policies and concludes that the proposals comply with the policies of the comprehensive plan.[61]
¶ 36 The council erred when it concluded the proposed rezones were inconsistent with the comprehensive plan.

4. Substantial Relationship to the Public Health, Morals, or Welfare
¶ 37 The council concluded that the proposals did not bear a substantial relationship to the public health, safety, morals, or welfare. However, neither the council's findings nor the record supports this conclusion.
¶ 38 In Henderson v. Kittitas County,[62] Division Three held that a rezone that furthered the goals of a comprehensive plan was a benefit to the public health, safety, morals and welfare. The court stated that "[t]he primary benefit of the rezone . . . is that it furthers the goals of the comprehensive plan to increase diverse uses of rural county lands and to decrease `rural sprawl.'"[63] Here, the hearing examiner relied on Henderson to conclude that the proposed rezones promoted the public health, safety, morals, and welfare *812 because they were consistent with the comprehensive plan.
¶ 39 The proposals further the city's land use policy LU-1.1 by helping the city accommodate its GMA residential growth forecasts. As stated in the FEIS, the proposed action does more to further this goal than any of the alternatives evaluated by the city in the FEIS.[64] The proposed action also furthers LU-1.3, the city's goal of phasing growth and municipal services together, by extending sanitary sewer, building on-site storm drainage facilities, and making street frontage improvements.[65] The proposed action furthers LU-3.7 and housing policy H-1.1 by increasing the variety of housing types and lot sizes in the area, which is currently developed as large one-acre residential lots.[66]
¶ 40 The proposed rezones further a number of comprehensive plan policies and therefore bear a substantial relationship to the public health, safety, morals, and welfare.
¶ 41 In sum, WMC 21.04.080 requires that the city approve an otherwise qualified rezone application unless adequate services cannot be provided. The record establishes that adequate services can be provided to the proposed developments. Contrary to the city's contentions, there is a demonstrated need for additional R-4 zoning and the proposals are consistent with the comprehensive plan and bear a substantial relationship to the public health, safety, morals, and welfare. The rezones are also consistent and compatible with uses and zoning of the surrounding properties, and the property is practically and physically suited for the uses allowed in the proposed zone reclassification, as required by WMC 21.44.070. We reverse the city council's denial of the rezones and remand to the city to grant the rezones.

C. Preliminary Plat Application
¶ 42 The council denied Phoenix's preliminary plat applications on the basis that the subdivisions were inconsistent with the R-1 zone. Because we reverse the council's rezone decision, we remand to the city for consideration of Phoenix's preliminary plat applications.

Conclusion
¶ 43 The city council erred when it concluded that adequate services could not be provided to the subject properties, that the rezones were inconsistent with the Woodinville comprehensive plan, that there was no demonstrated need for the rezones, and that the rezones do not bear a substantial relationship to the public health, morals, or welfare. The council further erred by engaging in an unlawful legislative procedure during a quasi-judicial decision-making process. Because the proposed rezones meet all statutory and common law requirements for rezones, we reverse the denial of the rezones and remand for reconsideration of Phoenix's preliminary plat applications.
¶ 44 Reversed and remanded.
WE CONCUR: SCHINDLER, C.J., and ELLINGTON, J.
NOTES
[1] Hearing Examiner's Wood Trails Decision (WTHE), May 16, 2007, at 4; Hearing Examiner's Montevallo Decision (MHE), May 16, 2007, at 4.
[2] WTHE Ex. 17; MHE Ex. 17.
[3] WTHE at 4-5; MHE at 4.
[4] MHE at 4-5.
[5] FEIS at 1-10 through 1-43.
[6] FEIS at 1-9.
[7] WMC 21.44.070.
[8] Wood Trails Staff Report at 32; Montevallo Staff Report at 27.
[9] WTHE at 23-40; MHE at 22-35.
[10] WTHE at 16-22; MHE at 15-20.
[11] City Council's Montevallo Decision (MCC), August 20, 2007, Conclusion 9; City Council Wood Trails Decision (WTCC), August 20, 2007, Conclusion 9.
[12] WTCC Findings 6.d, 9, 10.
[13] MCC Conclusion 1, Finding 13; WTCC Conclusion 1, Finding 14.
[14] MTCC Conclusion 2, Findings 11-25; WTCC Conclusion 2, Findings 13-26.
[15] MCC Findings 15-26, Conclusions 2-8; WTCC Findings 15-27, Conclusions 2-8.
[16] MCC Findings 24-25; WTCC Findings 25-26.
[17] Woods v. Kittitas County, 162 Wash.2d 597, 610, 174 P.3d 25 (2007) (citing RCW 36.70B.020(4)).
[18] Woods, 162 Wash.2d at 610, 174 P.3d 25.
[19] Woods, 162 Wash.2d at 616, 174 P.3d 25.
[20] RCW 36.70C.130(1).
[21] Habitat Watch v. Skagit County, 155 Wash.2d 397, 405-06, 120 P.3d 56 (2005) (quoting Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 176, 4 P.3d 123 (2000)).
[22] J.L. Storedahl & Sons, Inc. v. Clark County, 143 Wash.App. 920, 928, 180 P.3d 848 (2008).
[23] Woods, 162 Wash.2d at 617, 174 P.3d 25.
[24] Storedahl, 143 Wash.App. at 928, 180 P.3d 848.
[25] These policies are relevant where, as in this case and in Woods, the zoning code expressly requires that any rezone be consistent with the comprehensive plan.
[26] Storedahl, 143 Wash.App. at 931, 180 P.3d 848.
[27] See Chaussee v. Snohomish County Council, 38 Wash.App. 630, 634-35, 689 P.2d 1084 (1984).
[28] Woods, 162 Wash.2d at 616, 174 P.3d 25.
[29] Woods, 162 Wash.2d at 613, 174 P.3d 25.
[30] Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 875, 947 P.2d 1208 (1997).
[31] Bjarnson v. Kitsap County, 78 Wash.App. 840, 845-46, 899 P.2d 1290 (1995) (citing Save Our Rural Environment v. Snohomish County, 99 Wash.2d 363, 370-71, 662 P.2d 816 (1983)).
[32] WMC 21.04.020
[33] MCC Conclusion 2.
[34] City of Woodinville Ordinance No. 175.
[35] No. 96-3-0031, 1997 WL 123989 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. February 25, 1997) (Hensley I).
[36] Hensley I, at 8.
[37] Hensley I, at 7.
[38] Hensley I, at 11.
[39] Hensley v. City of Woodinville, No. 96-3-0031, 1997 WL 816261 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. October 10, 1997) (Hensley II).
[40] MCC Finding 24; WTCC Finding 25.
[41] MCC Conclusion 5; WTCC Conclusion 5.
[42] MCC Conclusion 9; WTCC Conclusion 11.
[43] FEIS at 3.5-94.
[44] FEIS 3.5-73.
[45] MHE at 9.
[46] MHE at 10; WTHE at 11.
[47] MCC Finding 6; WTCC Finding 6.
[48] MHE Finding 13; WTHE Finding 13.
[49] MHE Finding 14; WTHE Finding 14.
[50] MHE Conclusion 2.A at 10; WTHE Conclusion 2.A at 10.
[51] Woods, 162 Wash.2d at 613, 174 P.3d 25.
[52] Montevallo Staff Report at 16; Wood Trails Staff Report at 20.
[53] MHE at 8, WTHE at 9.
[54] City of Arlington v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 138 Wash.App. 1, 24-25, 154 P.3d 936 (2007).
[55] Hensley I, at 7.
[56] Hensley I, at 8.
[57] Hensley II, at 2.
[58] MCC at 2; WTCC at 2.
[59] EIS 3.4-22 through 3.4-28.
[60] FEIS 3.4-27.
[61] Montevallo Staff Report at 10; Wood Trails Staff Report at 13.
[62] 124 Wash.App. 747, 756, 100 P.3d 842 (2004).
[63] Henderson, 124 Wash.App. at 756, 100 P.3d 842.
[64] FEIS, 3.4-22.
[65] FEIS at 3.4-23.
[66] FEIS at 3.4-24.